8

NATIONWIDE MUTUAL INSURANCE COMPANY, ET AL.

V.

HOUSING OPPORTUNITIES MADE EQUAL, INC.*

Record No. 990733

January 14, 2000

Present: All the Justices

---

\* Rehearing was granted in *Nationwide Mutual Insurance Co. v. HOME*, and the opinion handed down on January 14, 2000 was withdrawn on March 3, 2000.

*Edward W. Warren (Lewis T. Booker; R. Hewitt Pate; Daniel F. Attridge; Christopher Landau; John P. Frantz; Hunton & Williams; Kirkland & Ellis,* on briefs), for appellants.

*Timothy M. Kaine (Thomas Wolf; Rhonda M. Harmon; Stephen Dane; Mezzullo & McCandlish; Cooper, Walinski & Cramer,* on brief), for appellee.

*Amici Curiae:* American Insurance Association, National Association of Independent Insurers, Alliance of American Insurers, and National Association of Mutual Insurance Companies (Andrew L. Sandler; Benjamin B. Klubes; Joseph L. Barloon; Harold S. Reeves; Robert W. Warnement; Skadden, Arps, Slate, Meagher & Flom, on brief), in support of appellants.

*Amicus Curiae:* NAACP Legal Defense and Educational Fund, Inc. (Henry L. Marsh, III; Elaine R. Jones; Norman J. Chachkin; Leslie M. Proll; Reed N. Colfax; Hill, Tucker & Marsh, on brief), in support of appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

The Virginia Fair Housing Law, Code §§ 36-96.1 through -96.23, makes it "unlawful for any person or other entity . . . to discriminate against any person in making available [a residential real estate-related] transaction, or in the terms or conditions of such a transaction, . . . because of race, color, religion, national origin, sex, elderliness, familial status, or handicap." Code § 36-96.4(A). A residential real estate-related transaction means, *inter alia,* "[t]he . . . insuring . . . of residential real property." Code § 36-96.4(B)(2).

In an amended motion for judgment filed March 21, 1997, Housing Opportunities Made Equal, Inc. (HOME), a fair housing organization, sought damages from Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company (collectively, Nationwide) for discriminatory practices allegedly employed by Nationwide in the provision of homeowners insurance to African-Americans in the Richmond area. A jury awarded HOME a verdict of $500,000 in compensatory damages and $100,000,000 in punitive

damages. The trial court entered judgment on the verdict, and we awarded Nationwide this appeal.

### The Parties

HOME is a nonprofit Virginia corporation formed in 1971 with the mission of promoting fair housing in Central Virginia, including the Richmond metropolitan area. In carrying out its mission, HOME's first priority is counseling, education is second, and advocacy, which includes litigation, is third. HOME counsels clients about their housing needs or problems. HOME trains the housing industry "to make sure [its members] don't violate the fair housing laws" and also educates "housing consumers about what their rights . . . and . . . responsibilities are." HOME resorts to litigation if counseling and education "are not enough to ensure equal access."

Nationwide writes insurance. It states on brief that it "has long been one of the leading providers of homeowners' insurance in the Richmond metropolitan area, [insuring] thousands of houses throughout the city and the surrounding suburbs."

### The Nature of the Controversy

HOME charged in its amended motion for judgment that "Nationwide has, for many years, intentionally pursued a strategy whereby the company avoids providing insurance in African-American neighborhoods" and "has followed an express policy of not targeting urban areas, containing significant minority populations, for the marketing of homeowners policies." In its grounds of defense, Nationwide denied HOME's allegations.

HOME submitted the following evidence concerning the discriminatory practices allegedly employed by Nationwide.

### Marketing Activities

In the late 1980s, Nationwide was "in a position of stagnant market share growth, and if [it] did not make some significant change, [it] would begin losing [its] market share." Accordingly, in 1990, Nationwide developed a "Marketing Strategy" for the Richmond area which stated that "after reviewing household growth, median income, median home value, 13+ years of schooling, and median age," the nearby counties of Henrico, Hanover, and Chesterfield "were identified as grow fast areas" and as "targeted counties." The City of Richmond was mentioned in the strategy only tangentially; it was not included as a targeted market.

The strategy identified eleven zip codes in the three counties as representing "the profile of Nationwide's select risk market." However, 23227, a Henrico zip code bordering the northern edge of the City of Richmond, was singled out for this comment:

> We have no data to support identification of emerging ethnic or minority groups. However, of our targeted counties, only one zip code was discovered to have greater than the statewide average for minority groups — this was zip code 23227 (Henrico).

Following development of the marketing strategy, Nationwide implemented a marketing tool known as "MicroVision," which "is produced on a zip code basis [and] characterizes zip codes by particular lifestyle categories. . . . [T]hese lifestyle segments purport to describe various homogeneous populations . . . by their race, by the kinds of things they read, . . . by their income."[1] The segments were assigned designations with such names as "Lap of Luxury," "Established Wealth," "Metro Minority Families," "Struggling Minority Mix," and "Difficult Times." The segments were then placed into one of five marketing groups: "Affluent"; "Mainstream"; "Mature"; "Country Living"; and "Remaining Diverse." The first four groups were considered desirable markets. The fifth, "Remaining Diverse," was considered undesirable. MicroVision placed every predominantly minority neighborhood of the City of Richmond, *i.e.*, those with minority population of 50% or more, in the "Remaining Diverse" group.

Nationwide's marketing activities also included the production of a "Local Area Market Plan" (LAMP), which divided a given geographic area into zip codes and ranked them as "Best in State," "Best in Market," "Next Best in Market," and "Remaining." The first three zip codes were considered desirable markets. The fourth, "Remaining," was considered undesirable. Like MicroVision, LAMP placed every predominantly minority neighborhood of the City of Richmond in the "Remaining" group.

Further, Nationwide performed a "geographic realignment" to "identify where [it wanted its] markets to be, and which populations [it wanted] to target." Among the "natural geographic boundaries" to be considered in "planning the ideal geographic market" were

---

[1] Nationwide's director of retail sales testified that "an effort [was made] to withdraw any racial references . . . completely" before the MicroVision materials were distributed.

"cultural or ethnic areas." In Nationwide memoranda dated March 25, 1996, and April 3, 1996, recommending realignment of marketing districts in Central Virginia, the population of the City of Richmond was not included in any marketing district, although rural jurisdictions with smaller populations were included.[2]

Finally, HOME highlights Nationwide's treatment of zip code 23227 in Henrico County. This was one of the eleven zip codes identified by Nationwide in its 1990 Marketing Strategy as representing the profile of its select risk market. HOME says that "[e]ach of the 11 areas was overwhelmingly white, but . . . 23227 . . . had a minority percentage in excess of the state average," and Nationwide over the years has consistently ignored "this one zip code, while devoting extra attention to the other 10." The differential treatment consisted of excluding 23227 from Nationwide's targeted zip codes and placing it in the undesirable "Remaining" category in every LAMP and MicroVision listing.

### Location of Agents

An expert witness called by HOME testified that Nationwide followed "a consistent pattern . . . of placing [its] agents in the target markets." Nationwide encouraged existing agents to move their offices, or to change their focus, from a non-targeted to a targeted area and, if they refused, the company would "ultimately [remove their] binding authority if necessary." Without binding authority, an agent cannot deliver a policy to a customer "until it's gone through the whole underwriting process." While Nationwide had four agency offices in predominantly minority areas of the City of Richmond in 1990, it had none at the time of trial.

HOME again highlights Nationwide's treatment of zip code 23227. In 1990, three of the eleven zip codes targeted in Henrico, Hanover, and Chesterfield Counties, including 23227, had no agents. By the time of trial, however, Nationwide had placed agents in every one of the eleven zip codes except 23227, despite the fact that 23227 had one of the best loss ratios of the eleven zip codes in 1990.

---

[2] HOME states on brief that two former Nationwide agents "testified without contradiction that Nationwide consistently denied insurance to insurable homes in minority neighborhoods." However, what one of the former agents actually said was that Nationwide "never told us nothing in writing, but they implied it," and the other former agent said that "they didn't tell you . . . not to write in those sections, but the way the rules were written up, it seems like we could not do it."

### Hiring and Training Policies

Nationwide instructed its managers to "search for the agent candidate and staff within the target market." One manager testified that of thirty-two agents he supervised in an area including the City of Richmond prior to the time this proceeding was filed, none was African-American. Another manager in the Richmond area testified that he had hired thirteen new agents in the period from 1991 to the time this proceeding was filed, and none was African-American.

Nationwide required its new agents to undergo extensive instruction, but the course did not include anti-redlining training, *i.e.*, instruction on the necessity to avoid the unlawful exclusion of geographical areas from consideration for homeowners insurance. An early version of LAMP cautioned against redlining, but Nationwide later removed the cautionary language.

### Underwriting Standards

Nationwide's underwriting standards were described as having "a disproportionate effect on people who live in minority neighborhoods." Nationwide offered two types of homeowners policies, the "Golden Blanket" policy, providing for replacement of a dwelling and its contents regardless of actual replacement cost, and the "Elite II" policy, providing for replacement limited to the face value of the policy. Nationwide called Golden Blanket its "Cadillac" policy and Elite II its "weak-sister" policy. Golden Blanket policies were not available for dwellings that were more than 30 years of age or valued at less than $90,000. Elite II policies were available for older dwellings, but if they were more than fifty years old and located in the "inner city," agents were "required to carefully inspect each home inside and out before actually writing the application." It was established that "the minority population lives . . . predominantly in the areas with older housing much more so than the white population."

HOME cites evidence from Nationwide's "own documents [which] showed that its market penetration in Richmond's minority zip codes was less than 50 percent of its penetration in white zip codes" and that "[t]he penetration for the Golden Blanket policy was more than 20 times higher in white neighborhoods than in minority neighborhoods." HOME says that "Nationwide had so avoided minority neighborhoods in Richmond that one of the company's managers described those areas as the 'hole in the donut.' "

## Pricing

The evidence showed that the company placed the City of Richmond in a separate pricing territory and then established "base rates for the city . . . higher than the base rates for the surrounding counties." The rates were "actually somewhat higher than indicated by Nationwide's own experience in Richmond," and the "price would have been less, except [that Nationwide] used . . . an unsound practice of using competitor information in Richmond." Nationwide also charged a higher premium for its "weak-sister" Elite II policy, which was more adaptable to the older housing found in minority areas, than it charged for the Golden Blanket policy.

## Advertising

Nationwide conducted a minority market study and produced a report that the specific minority groups studied, which included African-Americans, "separately and together, are large enough to be important market segments." The report also stated that "the African-American market would be the easiest and most efficient (as a result of [Nationwide's] geographic concentration) for which to formulate new programs." The report cautioned that African-Americans cannot be reached by advertising in mass-market publications like *Time* and *Newsweek* but that "to reach specific segments efficiently within the Black population, advertising must include black-interest publications (e.g *Black Enterprise, Ebony*)." The report's conclusion was that "a specific marketing strategy to target these groups individually does not seem warranted for Nationwide's property/casualty operations," and Nationwide continued to advertise in "primarily the weeklies, Time or Newsweek, Sports Illustrated, Southern Living, People Magazine."

## Testers

HOME employed trained testers to contact Nationwide agents for "insurance quotes" on test homes over a period extending from June or July of 1995 to October of 1996. HOME chose three pairs of test homes. Each pair was matched for similar features and age, but one home of the pair was located in a minority neighborhood and the other in a white neighborhood. When completed, the testing showed that quotes had been denied in nine out of fifteen tests for homes in the minority neighborhoods and only four out of sixteen tests in the white neighborhoods.

The agents gave various reasons for their denial of quotes in the minority neighborhoods, including that Nationwide did not insure homes more than fifty years old or valued at less than $60,000 and that the company required thirty-days notice prior to closing to write insurance. One agent admitted on the witness stand that an employee of his office had told an untruth when she informed an African-American tester that the office did not insure homes more than fifty years old. Shortly before, the office had given a quote to a white homeowner on a house of similar age.[3]

## *Discussion*

■ Nationwide's appeal presents a number of questions, including whether HOME has standing to maintain its action for damages against Nationwide. "Standing to maintain an action is a preliminary jurisdictional issue having no relation to the substantive merits of an action," *Andrews v. American Health & Life Insurance Co.*, 236 Va. 221, 226, 372 S.E.2d 399, 402 (1988), and, accordingly, is a matter for determination by the court.

■ Nationwide raised the standing issue in a motion for summary judgment that was filed, heard, and denied pretrial. HOME contends, however, that Nationwide later conceded the standing issue by failing to object to an instruction granted by the trial court that permitted the jury to consider damage to HOME's "mission, purpose, and efforts to promote equal access to housing." We disagree with HOME.

We recently confronted a similar situation in *Wright v. Norfolk & Western Railway Co.*, 245 Va. 160, 427 S.E.2d 724 (1993). There, the railway company failed to object to an instruction which permitted the jury to decide whether the plaintiff was guilty of contributory negligence. During argument on the railway company's motion to set aside an adverse verdict, the plaintiff argued that by failing to object to the instruction, the railway company had "waived its right to rely on the proposition that [the plaintiff] was guilty of contributory negligence as a matter of law." *Id.* at 166, 427 S.E.2d at 727. The trial

---

[3] In a section of its brief entitled "Nationwide's Recognition of its Discrimination in Richmond," HOME cites the report of a 1996 Urban Market Study conducted by Nationwide. HOME points to language in the report to the effect that Nationwide was "reducing market share in the city," that one of the challenges to Nationwide's increasing its presence in the "Inner City Market" was "**Ethnic Neighborhoods**," that there was "**Higher Fraud/Theft Potential**" in the inner city, and that Nationwide "would want to evaluate [its] homeowners pricing in the city to be *less* competitive."

court ruled that no waiver had occurred and that the plaintiff was guilty of contributory negligence as a matter of law. *Id.*

We affirmed. We said there was no waiver because the railway company had consistently maintained the position throughout the trial that no jury issue was presented on the question of the plaintiff's contributory negligence. This, we stated, gave the trial court the opportunity to rule intelligently on the issue, which is the main purpose of our contemporaneous objection rule, Rule 5:25. 245 Va. at 168, 427 S.E.2d at 728. *See also Chawla v. BurgerBusters, Inc.*, 255 Va. 616, 622, 499 S.E.2d 829, 832 (1998).

█ Here, Nationwide continued throughout the proceedings to insist that HOME lacked standing to maintain its action against Nationwide. Nationwide took this position in its pretrial motion for summary judgment, in its motion to strike at the close of HOME's evidence, in its motion to strike at the conclusion of all the evidence, and in its motion for a new trial.[4] This clearly afforded the trial court ample opportunity to rule on the issue of HOME's standing. Indeed, at the very end of the case, after Nationwide's counsel told the trial court he was concerned "that all [his] objections are preserved for the record," the judge remarked: "I say that you have preserved every argument that you have made from the time that the case was filed until now." We hold that Nationwide did not waive or concede the standing issue.

█ This brings us to the merits of Nationwide's contention that HOME lacked standing to maintain its action for damages because it "failed to establish below that it was in any way '*aggrieved*' by Nationwide's alleged discrimination against 'African-American neighborhoods' in the City of Richmond." An "aggrieved person" is defined in the Virginia Fair Housing Law as one who "claims to have been injured by a discriminatory housing practice" or "believes that such person will be injured by a discriminatory housing practice that is about to occur." Code § 36-96.1:1. "Person" is defined to include, *inter alia*, "fair housing organizations." *Id.*[5] And "[a]n

---

[4] HOME also contends that Nationwide conceded the standing issue in its post-trial motion for a new trial, but the portions of the motion HOME refers us to cannot possibly be read as constituting a concession and, in any event, Nationwide prefaced the motion with the statement that the motion "incorporates by reference . . . all issues previously raised by Nationwide, including (but not limited to): (i) HOME lacked standing as a matter of law."

[5] HOME points out that the Virginia Fair Housing Law originally included only a "corporation, association or unincorporated organization" in its definition of "person" and that, in 1991, the General Assembly added "fair housing organizations" to the definition. HOME says that, by this addition, "the legislature made clear that the standing of [fair housing] organiza-

aggrieved person may commence a civil action in an appropriate United States district court or state court . . . to obtain appropriate relief with respect to such discriminatory housing practice . . . ." Code § 36-96.18.

HOME argues that "[t]here can be no question that [it] is a fair housing organization and that it has claimed Nationwide's discriminatory housing practices have injured it." "Thus," HOME concludes, "under the plain language of the statute, HOME has standing." In other words, it is HOME's position that the statute imposes a less restrictive standard for standing than might otherwise be required, with the result that HOME establishes its standing merely by stating the terms of the statute.

When HOME made this argument in the trial court, the trial judge remarked, "You can't just say it, there really has . . . to be some — ," at which point HOME's counsel said, "There has to be some meat to it, yes, Your Honor. And HOME has showed that there is meat to it in this case. And that's shown under the common law of Virginia and we've presented to the court [the] common law of Virginia with respect to standing." HOME's counsel also said "the federal law, which is persuasive authority, . . . likewise shows that HOME has standing in this case," and counsel named *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), as the persuasive authority.

Thus, in the trial court, HOME asserted three bases for its claim to standing, *i.e.*, the Supreme Court's decision in *Havens*, the Virginia Fair Housing Law, and the common law of Virginia. HOME asserts the same three bases on appeal.

### *Havens Realty Corp. v. Coleman*

HOME says that *Havens* "establishes [its] standing." In *Havens*, HOME and others brought a class action under the federal Fair Housing Act against Havens Realty Corp. for declaratory, injunctive, and monetary relief for Havens' alleged "racial steering" in its operation of two apartment complexes in Henrico County. HOME alleged that Havens' discriminatory practices had injured HOME by frustrating its mission and causing a drain on its resources. On Havens' pretrial motion, the district court dismissed the action, holding that the plaintiffs lacked standing. The United States Court of Appeals for the

---

tions was to be distinguishable from generic types of corporations, associations, or organizations."

Fourth Circuit reversed, and the Supreme Court granted certiorari. 451 U.S. 905 (1981).

In its opinion, the Supreme Court stated that "the sole requirement for standing to sue under [the federal Fair Housing Act] is the [federal Constitution's] Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and palpable injury.' " 455 U.S. at 372. The Court held that HOME's allegations of injury concerning the frustration of its mission and a drain on its resources were sufficient to withstand Havens' motion to dismiss. *Id.* at 379. The Court observed in a footnote that "HOME will have to demonstrate at trial that it has indeed suffered impairment in its role of facilitating open housing before it will be entitled to judicial relief." *Id.* n.21.

 *Havens* involved interpretation of the federal Fair Housing Act in a context presenting a question of non-constitutional federal law. Accordingly, the decision is not binding on this Court in this case involving a state statute and a pure question of state law.[6] While the Virginia statute contains a provision (Code § 36-96.23) that "[n]othing in [the Virginia Fair Housing Law] shall abridge the federal Fair Housing Act of 1968 (42 U.S.C. § 3601 et seq.)," nothing in the Virginia statute requires that it be interpreted according to federal law.[7]

### The Virginia Fair Housing Law

 It is true, of course, as HOME maintains, that the statute permits an action to be brought by an "aggrieved person," defined as one who claims to have been or believes he will be injured. But the statute does not fix a standard for determining whether standing exists. Undeniably, HOME is a "person" under the statute, but whether it is an "aggrieved person" turns on whether it has been or will be injured. Hence, the key word is "injured"; however, it is undefined. We resort, therefore, to the common law of Virginia for the appropriate standard for determining standing, a standard that was already in place in 1991 when the Virginia Fair Housing Law was amended to include the definition of an "aggrieved person" and to add fair housing organizations to the definition of "person." 1991

---

[6] We note that HOME cites "numerous" (10) lower federal court decisions in which standing was found to exist under the federal Fair Housing Act.

[7] HOME's counsel stated during oral argument that the Virginia fair housing statute provides that "it is to be interpreted in a manner substantially equivalent to federal law." However, the statute does not support this statement.

Va. Acts ch. 557. And nothing in the 1991 amendment indicates an intention on the part of the General Assembly to lower that standard.

### The Virginia Common Law

Admittedly, the Virginia common law standard is more restrictive than its federal counterpart. In *Nicholas v. Lawrence*, 161 Va. 589, 171 S.E. 673 (1933), we said that for a person to have standing to invoke the jurisdiction of a court, "he must show that he has an *immediate, pecuniary and substantial interest* in the litigation, and not a remote or indirect interest." *Id.* at 593, 171 S.E. at 674 (emphasis added). In *Cupp v. Board of Supervisors*, 227 Va. 580, 318 S.E.2d 407 (1984), we said that the "concept of standing concerns itself with the characteristics of the person or entity who files suit" and that "[t]he essence of the standing inquiry is whether [such person or entity has] '*a personal stake in the outcome of the controversy.*'" *Id.* at 589, 318 S.E.2d at 411 (quoting *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 72 (1978) (emphasis added in *Cupp*)). And in *Virginia Beach Beautification Commission v. Board of Zoning Appeals*, 231 Va. 415, 344 S.E.2d 899 (1986), we said:

> In order for a petitioner to be "aggrieved," it must affirmatively appear that such person has some *direct* interest in the subject matter of the proceeding that he seeks to attack. . . . [I]t is not sufficient that the sole interest of the petitioner is to advance some perceived public right or to redress some anticipated public injury . . . . The word "aggrieved" in a statute contemplates a substantial grievance and means a denial of some *personal* or property right . . . or imposition of a burden or obligation upon the petitioner different from that suffered by the public generally.

*Id.* at 419-20, 344 S.E.2d at 902-03 (emphasis added).

HOME says it has standing to maintain its action against Nationwide because it "can identify economic and non-economic injuries resulting from Nationwide's discriminatory activities." According to HOME, its injuries consist of the frustration of its mission, the diversion of its resources, and the discrimination practiced against its "tester/agents."

## Frustration of Mission

HOME's claim based upon the frustration of its mission fails the Virginia test for standing. HOME itself has not suffered any denial of homeowners insurance and cannot claim injury based upon such a denial. It relies instead upon the purported injury to others resulting from Nationwide's discriminatory practices. And, in the trial court, HOME included in its claim of purported injury to others resulting from Nationwide's practices "the harm caused to the city of Richmond, individuals, neighborhoods, the tax base."

Hence, HOME's interest in the litigation and its purported injury are not "immediate, pecuniary and substantial" but "remote or indirect." *Nicholas*, 161 Va. at 593, 171 S.E. at 674. HOME's purported injury is not "different from that suffered by the public generally." *Virginia Beach Beautification Commission*, 231 Va. at 420, 344 S.E.2d at 903. And HOME's interest in this litigation is reduced to an effort "to advance some perceived public right or to redress some anticipated public injury." *Id.* at 419, 344 S.E.2d at 902.

Furthermore, Virginia is not a class-action state, and "[a]n individual or entity does not acquire standing to sue in a representative capacity by asserting the rights of another, unless authorized by statute to do so." *W. S. Carnes, Inc. v. Board of Supervisors*, 252 Va. 377, 383, 478 S.E.2d 295, 300 (1996). The Virginia Fair Housing Law does not bestow such representative authority. To say, therefore, that HOME has standing in this case would, in effect, convert the proceeding into a class action and permit HOME to sue in a representative capacity for discriminatory housing practices directed against someone else who may not himself have the required standing to sue.

## Diversion of Resources

HOME's claim to standing based upon the diversion of its resources involves some $56,000 that HOME spent investigating and testing Nationwide for its alleged discriminatory practices. This sum consists in part of $6,000 to $7,000 of HOME's own funds, representing the cost of staff time spent in preparation for this litigation. The balance, paid from federal grants totaling approximately $1.2 million, represents the pro rata share attributable to Nationwide of the cost of HOME's investigation of approximately thirty insurance companies, including Nationwide, writing homeowners coverage in Richmond. Also involved in HOME's diversion of resources claim to standing is the value of a federal grant for education that HOME lost

when it chose instead an enforcement grant in order to continue with its investigation of the insurance industry. Finally, HOME says that it had to divert resources from other testing and education programs to identify Nationwide's discriminatory practices.

It is elementary that one who seeks damages as redress for wrongful action must not only prove the wrongful action but also a causal connection between the wrongful action and the injury complained of. *Phillips v. Southeast 4-H Educ. Ctr.*, 257 Va. 209, 215, 510 S.E.2d 458, 461 (1999). Even *Havens* requires that an injury be " 'fairly traceable' " to a discriminatory practice to satisfy the requirement of injury in fact. 455 U.S. at 376.

There can be no causal connection between action, even though wrongful, and injury that is self-inflicted. HOME's executive director testified below that "[p]rior to HOME undertaking . . . the systemic industry homeowners insurance investigation" when HOME's first federal grant "came through" on January 1, 1995, HOME had "received no complaints about Nationwide in the Richmond area."[8] HOME's decisions to undertake the investigation, to spend part of the grant funds on the investigation, to devote staff time to preparation for this litigation, to choose an enforcement grant rather than an educational grant, and to divert resources from other testing and education programs were all made voluntarily, independent of anything Nationwide did or failed to do with respect to minority neighborhoods in the City of Richmond.

What was said in *Fair Employment Council v. BMC Marketing Corp.*, 28 F.3d 1268 (D.C. Cir. 1994), is pertinent here:

> The diversion of resources to testing might well harm the Council's other programs, for money spent on testing is money that is not spent on other things. But this particular harm is self-inflicted; it results not from any actions taken by BMC, but rather from the Council's own budgetary choices.

*Id.* at 1276.

And this from *Association for Retarded Citizens v. Dallas County*, 19 F.3d 241 (5th Cir. 1994), a fair housing case:

---

[8] HOME's executive director testified HOME knew that Nationwide had been sued in Toledo, Ohio, for discriminatory practices and had filed a lawsuit against the Secretary of Housing and Urban Development contending that the fair housing laws did not cover Nationwide.

The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.

*Id.* at 244.

 Also pertinent is this statement from another fair housing case, *Project Sentinel v. Evergreen Ridge Apartments*, 40 F. Supp.2d 1136 (N.D. Cal. 1999):

Plaintiff cannot manufacture standing by first claiming a general interest in lawful conduct and then alleging that the costs incurred in identifying and litigating instances of unlawful conduct constitute injury in fact.

*Id.* at 1139.

### *Discrimination against "Tester/Agents"*

HOME's claim to standing based upon the discrimination practiced against its "tester/agents" rests on even shakier grounds. HOME theorizes that "when the testers encountered discrimination by Nationwide, that was an affront to the testers, who were HOME's agents, and an insult to HOME's fair housing work."

But the testers suffered no recognizable injury. They had no *bona fide* interest in purchasing insurance from Nationwide; indeed, HOME stipulated that "none of the testers were authorized to purchase insurance." The testers did not even ask for quotes on their own homes.

 Furthermore, a tester did not know who his or her partner was or what race the partner belonged to, did not know what home the partner was testing, whether the partner received quotes from Nationwide, or what the results of the partner's tests were. In short, the testers never directly encountered the effects of Nationwide's allegedly discriminatory practices and, hence, had no standing themselves to maintain an action for those practices. And it follows that the testers could not derivatively have bestowed standing upon HOME.

 That the testers have suffered no recognizable injury is exemplified by a holding of the trial court that is not at issue in this appeal. Originally, in addition to HOME, several individual owners of test homes in African-American neighborhoods in the City of Richmond were named as plaintiffs. However, they were dismissed

from the case on Nationwide's motion because, as the trial judge explained, they had not "suffered any damages that the law can recognize." Yet, HOME insisted that "[t]he individual plaintiffs in this case stand on the same footing, essentially, as testers." Nationwide says that "[t]he testers, who were merely *pretending to be* homeowners, cannot possibly have greater rights under the law," and we agree.

As one court put the matter in a fair housing case:

> [Testers] are investigators; they suffer no harm other than that which they invite in order to make a case against the persons investigated; there is no suggestion in this case that they were paid less to be testers than the opportunity costs of their time. The idea that their legal rights have been invaded seems an arch-formalism.

*Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990).

## CONCLUSION

With due respect for HOME's worthy mission of providing equal housing opportunities in the metropolitan Richmond area, we conclude nonetheless that HOME lacks standing to maintain its action against Nationwide. The trial court erred, therefore, in denying Nationwide's motion for summary judgment. Accordingly, we will reverse the judgment of the trial court, set aside the jury's verdict, and enter final judgment here in favor of Nationwide.

*Reversed and final judgment.*

JUSTICE HASSELL, with whom JUSTICE LACY and JUSTICE KEENAN join, dissenting.

I dissent because I disagree with the majority's conclusion that Housing Opportunities Made Equal, Inc., lacked standing to pursue its claims of racial discrimination against Nationwide. The General Assembly amended the Virginia Fair Housing Law in 1991 to permit housing organizations such as HOME to pursue housing discrimination claims in the courts. HOME proved with overwhelming evidence that Nationwide engaged in intentional acts of racial discrimination against black citizens who reside in the City of Richmond. Yet, the majority concludes that housing organizations, such as

HOME, cannot use the courts to vindicate the rights of citizens who have been subjected to housing discrimination.

## I.

Plaintiffs, Housing Opportunities Made Equal, Inc., (HOME), Donna Sully, Wanda Canada, and Shelton Jones, filed their amended motion for judgment against defendants, Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Jim Bocrie, Bond-King & Associates, Butler & Hailey Insurance Agency, Cannon-Fincher Insurance Agency, Daniel J. Sizemore, John R. Stech, Jr., and Walton Insurance Agency. The plaintiffs alleged that the defendants committed acts of racial discrimination in violation of the Virginia Fair Housing Law.

During the course of a two-week trial, the circuit court granted the defendants' motion to strike the individual plaintiffs and also the defendants' motion to strike the insurance agents and agencies. At the conclusion of the trial, the jury returned a verdict of $500,000 in compensatory damages and $100,000,000 in punitive damages against Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company (hereinafter referred to as Nationwide). The circuit court entered a judgment confirming the verdict, and Nationwide appeals.

## II.

## A.

I will apply well-established principles of appellate review. A circuit court's judgment is presumed to be correct, *Wright & Hunt, Inc.* v. *Wright*, 205 Va. 454, 460, 137 S.E.2d 902, 907 (1964), and it will not be set aside unless it appears from the evidence that the judgment is plainly wrong or unsupported by the evidence. Code § 8.01-680; *Ravenwood Towers, Inc.* v. *Woodyard*, 244 Va. 51, 57, 419 S.E.2d 627, 630 (1992). A litigant who comes before this Court armed with a jury verdict approved by the circuit court "occupies the most favored position known to the law." *Pugsley* v. *Privette*, 220 Va. 892, 901, 263 S.E.2d 69, 76 (1980). On appeal, I will state the evidence and all reasonable inferences deducible therefrom in the light most favorable to HOME, the prevailing litigant at trial. *Ravenwood Towers*, 244 Va. at 57, 419 S.E.2d at 630.

## B.

HOME is a non-profit corporation organized under the laws of the Commonwealth of Virginia. It is also a fair housing organization formed in 1971 to make equal opportunity in housing a reality in central Virginia, which includes the City of Richmond. HOME was founded by a group of people, including members of the real estate industry, who were concerned about racially-segregated housing patterns and unfair housing discrimination in Richmond. Constance Chamberlin, HOME's executive director, stated that "HOME seeks to ensure equal access to housing for all persons through counseling, education, and advocacy." She testified that HOME provides counseling to individuals and families to assist them with their housing needs. HOME also provides education and training to members of the housing industry so that they are aware of the fair housing laws. HOME has programs to educate housing consumers about their rights and responsibilities. HOME is also an advocacy organization, but it considers litigation "[a] last resort."

In 1994, HOME received a federal grant from the United States Department of Housing and Urban Development to examine racial discrimination practices by insurance companies that issue homeowners' insurance. HOME's investigation included 30 insurance companies and insurance agencies. HOME also conducted a survey and received responses which indicated to HOME that black homeowners in predominantly black neighborhoods in the City of Richmond were charged more for homeowners' insurance than white homeowners in white neighborhoods in the City.

In the course of its investigation, HOME decided to conduct tests of insurance companies. HOME conducted 90 "pairs of tests" and 15 of those tests included Nationwide agents. Chamberlin described the tests as follows:

> "Insurance testing is a little bit different from rental testing, for instance. . . . In insurance testing, what you're doing, you're not matching people. You're matching houses. What we did was to try to find matched pairs of houses, houses that were similar in age and construction and maintenance. The primary difference between the houses is that one house would be in [a black] neighborhood and one house would be in a white neighborhood.
>
> "Testers were assigned to those houses. A tester who was going to make a call, a white tester would be assigned to a

white house in a white neighborhood to call about, and a black tester would be assigned to a black house in a black neighborhood to call about. Each would make calls to the same agency to see whether they could get homeowners['] insurance."

In response to the question, "Why do you need to use testing to investigate discrimination?", Chamberlin replied:

"Well . . . discrimination doesn't happen with somebody saying 'I'm not going to do this because.' People are too smart, if they are going to discriminate, to do it that way.

"Testing is frequently the only way that you can develop the evidence that will let you know what is really going on.

"Testing can . . . be a very clear indication of whether [racial] discrimination is occurring."

HOME employed a test coordinator to supervise the testing. All testers were trained "to be objective and careful observers." Chamberlin described the persons who conducted the tests as "some of [HOME's] most experienced testers. They were people who were trained and willing to do this." The testers were people with various professions and included "bankers and salespeople and directors of organizations."

Fifteen tests were conducted on Nationwide. Matthew Hines, HOME's test coordinator for the Nationwide tests, testified that he decided to test houses in Ginter Park, described as a white neighborhood in Richmond, and Highland Park and Barton Heights, described as black neighborhoods in Richmond.

Wanda Canada, a tester, testified that she called Daniel J. Sizemore, a Nationwide agent, on July 5, 1995. She told him that she desired to purchase a house in the Barton Heights neighborhood and that the closing date was July 24, 1995. She informed him that she desired to obtain a quote for homeowners' insurance. He refused to provide her with a quote for the insurance. He stated: "For homes over 50 years, we require a preinspection by one of our inspectors. We like to have a 30-day lead time to get an inspector out there, to check the plumbing, the roof; make sure that everything is okay." However, the same Nationwide agent, Daniel J. Sizemore, treated a white tester differently. Elizabeth Poe testified that on May 16, 1996, she contacted Sizemore. She informed him that she desired homeowners' insurance for a house located on East Seminary Avenue, which was described as a white neighborhood. She stated:

"I called him up and we spoke about the address. I told him the address of the neighborhood, and then he asked me a number of questions about the house, the age of [the] house, the construction and all of those things. And then at the . . . end he suggested that we needed to insure it for more than its value to have guaranteed replacement cost. I said: Would you insure it for the price, the purchase price? He said at that point he would need to — I need more information on the square footage. I agreed to call him back.

"He gave me a verbal quote over the phone. I called him back the next day with the square footage for the basement and each floor, and then he gave me a slightly different quote when he mailed me the written quote, which he mailed very promptly."

Canada also performed a test with Nationwide's agent, Al Taylor. She called Taylor on July 20, 1995, and told him that she intended to purchase a house in the Barton Heights neighborhood and that the house was 70 years old. Taylor refused to provide her with a quote for the requested insurance. Rather, he responded, "I don't have a market for it. . . . [I]t's 70 years old, and that's too bad, and the only thing I could do is call [another insurance company]." Sandra K. Green, a white tester, conducted a test with Al Taylor on July 10, 1995. She called him and told him that she was "buying a house and . . . needed quotes for homeowners['] insurance." In response to questions that he asked, she told him that the house she desired to insure was in Ginter Park and that the house was over 70 years old. He told her that he could provide her with homeowners' insurance and quoted her a premium of $344. Subsequently, he forwarded a written quote to her in the mail.

Regina Leftwich, a black tester, performed a test on Nationwide agent, John R. Stech, Jr. She placed a telephone call to Stech's office and Linda Estes answered the telephone. Leftwich told Estes that she desired to obtain homeowners' insurance for a house on Edgewood Avenue, which is located in the Barton Heights neighborhood. Estes asked her for the zip code of the property, and Leftwich gave it to her. Leftwich also informed Estes that the house was over 70 years old. She told Estes that the closing date was October 31. Estes initially told Leftwich that Leftwich could obtain insurance at a rate of $306 per year. Leftwich asked Estes to mail a written quote to her, and Estes promised to do so.

Later, Estes called Leftwich over the telephone and stated, "I saw the house, I can't insure it, sorry," and hung up the phone. Subsequently, Leftwich placed a telephone call to Estes and asked why "Nationwide was unable to write homeowners['] insurance . . . and was there an issue of which [she] should be aware. [Estes] said this particular Nationwide office did not write homeowners['] [insurance] for houses greater than 50 years of age."

At trial, Stech testified that he was aware that Linda Estes had spoken to Leftwich and that his office had sent a written quote for insurance to her. He also confirmed that he called Ms. Estes and told her that "[w]e cannot now give you a quote on this property" and that no reason was given for the failure to provide a quote. Stech gave the following testimony:

"Q: Ms. Estes told [Leftwich] that your office did not insure homes over 50 years old; is that correct?
"A: That's was Ms. Estes said, yes.

. . . .

"Q: When Ms. Estes told Ms. Leftwich that your office does not insure homes over 50 years old, that was untrue, wasn't it?
"A: Yes, it was.
"Q: Because you understood that Nationwide did insure homes over 50 years, didn't you?
"A: That's correct.
"Q: In fact, you, just within the few days prior or around the situation with Ms. Leftwich, you had issued quotes or processed insurance applications for homes that were over 50 years of age; correct?
"A: That's correct."

Stech also testified that he had mailed a written quote for homeowners' insurance to a white female for a home over 50 years old.

HOME's testing of Nationwide revealed that Nationwide refused to issue homeowners' insurance quotes for nine of the 15 tests for houses in black neighborhoods, which totaled a 60% rejection rate. However, Nationwide only refused to provide quotes for four of the 16 homes in white neighborhoods, a 25% rejection rate. Each pair of homes was matched, however, for similar features and age.

Nationwide agents gave the following reasons for their decisions to refuse to offer homeowners' insurance to homeowners in predomi-

nantly black neighborhoods: Nationwide did not insure homes over 50 years old; Nationwide needed 30 days notice before closing in order to write insurance; or Nationwide did not insure homes with market values less than $60,000. However, in each corresponding test, the white tester who received a quote had represented to the Nationwide insurance agent that the "quoted" house had a similar age, closing date, and market value as a house in a black neighborhood for which Nationwide refused to provide an insurance quote. In every test in which both homes received quotes, the quotes for insurance premiums given to the black testers were higher than the quotes given to the white testers.

Patrick Irvine, a Nationwide employee, had been the agency manager in central Virginia for over 28 years. He testified that a Nationwide agent can provide a homeowner with a quote even if a house is over 50 years old and an inspection has not been performed. The quote would simply be subject to a favorable inspection.

Joseph Lowe, III, a former Nationwide insurance agent, testified that Nationwide used race as a factor to distinguish between the issuance of homeowners' insurance policies to homeowners in black neighborhoods and homeowners in white neighborhoods. He gave the following testimony:

> "Q: Let me ask you: Do you remember, even generally, specific homes that you tried to insure in [black] neighborhoods that may have been comparable to homes in other neighborhoods?
>
> "A: I can't remember specific homes, but I can remember neighborhoods. In other words, some neighborhoods, primarily over in the Church Hill section [of Richmond], over in the east end, I would write a particular house, and Nationwide would not accept that house. And I, for certain reasons, I've seen houses of the same caliber written in white neighbor[hoods] that Nationwide did accept. And I even had cases where I'd go into a house in a neighborhood, wrote that house, wrote that particular house . . .
>
> "I've gone into certain neighborhoods and written houses that Nationwide rejected that particular house because of the house next door to it; in other words, saying that the house next door to it is too — it's too close, or too old, or something of that nature. When that same house that Nationwide rejected

was written in a . . . white neighborhood, I have gotten that same similar house through. Put it that way."

William H. Lee, Sr., another former Nationwide insurance agent, testified that Nationwide treated homeowners in black neighborhoods differently than it treated homeowners in white neighborhoods. He said that Nationwide implicitly directed its insurance agents that Nationwide did not wish to insure properties in certain black neighborhoods in Richmond. He also testified that Nationwide applied its insurance underwriting standards more stringently to houses in black neighborhoods:

"Q: And how did Nationwide's treatment, based on your observation and your experience, how did Nationwide's treatment of homes in [black] areas compare with Nationwide's treatment of homes in [white] areas?
"A. Much stricter.
"Q: Much more strict?
"A: That's right."

Nationwide used the racial composition of neighborhoods as a factor in its marketing strategies. After a 1990 market study, Nationwide used a racial profile report known as MicroVision. The developers of MicroVision identified every zip code in the United States and placed each zip code into one of 50 categories, evaluated primarily by racial identity. Nationwide used these designations that contained racially-offensive stereotypical names. For example, black communities with certain zip codes in Richmond were referred to as "difficult times." Members of this community were described as "working hard to survive, they have little time for recreation, but they do watch situation comedies and read TV Guide."

Nationwide divided Richmond zip codes into market groups and applied racial profiles to each zip code area. Four of the market groups were designated "affluent," "mainstream," "mature," and "country living," and were considered by Nationwide as favorable marketing groups. Neighborhoods comprised of white homeowners were placed in these favorable marketing classifications. Nationwide classified every black neighborhood in Richmond as unfavorable and placed the neighborhoods in an undesirable marketing category labeled "remaining diverse."

Nationwide also used a marketing tool referred to as its Local Area Marketing Plan to help define Nationwide's insurance market.

This marketing plan also placed every zip code into one of four categories: best in state, best in market, next best in market, and remaining. Every zip code area that had a predominantly black population in Richmond was placed in the "remaining" category.

John Robert Hunter, Jr., who served as the chief actuary of the Federal Insurance Administration Agency, and who was subsequently the administrator of the Federal Insurance Agency in the United States Department of Housing and Urban Development under two United States presidents, qualified as an expert witness on the subjects of regulation of insurance companies, issuance of homeowners' insurance policies, "redlining," insurance actuaries, and insurance surplus requirements. He testified that from an actuarial vantage, the racial composition of a neighborhood has no correlation to insurance risks. He testified that Nationwide's marketing data is not related to actuarial data or experience in the community, but that Nationwide's marketing plan and its MicroVision material contain racial identifiers. Hunter opined, without objection, that Nationwide's marketing policies and strategies indicate that Nationwide tried to avoid issuing insurance policies to black homeowners in black neighborhoods in Richmond.

Rick Becker, Nationwide's market manager for the Commonwealth of Virginia, testified that Nationwide's homeowners' insurance products that are sold in black neighborhoods are more expensive and less comprehensive than other Nationwide products which afford more protection to non-black homeowners. Dr. Scott Harrington, Nationwide's own expert witness, gave the following testimony:

"Q: A company's target market, in which you discuss target marketing, should not focus on racial characteristics of neighborhoods, should it?

"A: That would be illegal and unfair, in my opinion. It's illegal and, according to my opinion, it would be very unfair.

"Q: Just because a neighborhood is a minority neighborhood does not mean, for example, it's a bad risk or likely to have losses, for example, or excess losses, would it?

"A: You're correct."

Chamberlin, HOME's executive director, testified that HOME was forced to divert resources from other agency programs in order to conduct its investigation of Nationwide's racially-discriminatory practices. Additionally, HOME expended $6,000 to $7,000 worth of

staff time to conduct the investigation. HOME also was required to provide approximately $150,000 of its resources to implement a HUD-sponsored grant which it had obtained to investigate race or discriminatory practices in the provision of homeowners' insurance. HOME also had to divert resources from other programs to conduct its investigation.

III.

A.

Code § 36.96.1(B), which is part of the Virginia Fair Housing Law, states:

"It is the policy of the Commonwealth of Virginia to provide for fair housing throughout the Commonwealth, to all its citizens, regardless of race, color, religion, national origin, sex, elderliness, familial status, or handicap, and to that end to prohibit discriminatory practices with respect to residential housing by any person or group of persons, in order that the peace, health, safety, prosperity, and general welfare of all the inhabitants of the Commonwealth may be protected and insured. This law shall be deemed an exercise of the police power of the Commonwealth of Virginia for the protection of the people of the Commonwealth."

Code § 36-96.4 states in part:

"A. It shall be unlawful for any person or other entity, including any lending institution, whose business includes engaging in residential real estate-related transactions, to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, or in the manner of providing such a transaction, because of race, color, religion, national origin, sex, elderliness, familial status, or handicap. . . .
"B. As used in this section, the term *"residential real estate-related transaction"* means any of the following:
. . . .
"2. The selling, brokering, insuring or appraising of residential real property."

Code § 36-96.18(A) states in relevant part:

"An aggrieved person may commence a civil action in an appropriate United States district court or state court not later than two years after the occurrence or the termination of an alleged discriminatory housing practice . . . ."

Code § 36-96.1:1 states in part:

"For the purposes of this chapter, unless the context clearly indicates otherwise:
" '*Aggrieved person*' means any person who (i) claims to have been injured by a discriminatory housing practice or (ii) believes that such person will be injured by a discriminatory housing practice that is about to occur.

. . . .

" '*Discriminatory housing practices*' means an act that is unlawful under §§ 36-96.3, 36-96.4, 36-96.5, or § 36-96.6.

. . . .

" '*Person*' means one or more individuals, whether male or female, corporations, partnerships, associations, labor organizations, fair housing organizations, civil rights organizations, organizations, governmental entities, legal representatives, mutual companies, joint stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcy, receivers and fiduciaries."

## B.

Nationwide argues that HOME lacks standing under the Virginia Fair Housing Law to pursue a cause of action under the aforementioned statutes because HOME is not an "aggrieved person." Relying upon our decision in *Virginia Beach Beautification Commission v. Board of Zoning Appeals*, 231 Va. 415, 419, 344 S.E.2d 899, 902 (1986), Nationwide asserts that HOME must show that it has an immediate, pecuniary, and substantial interest in the litigation in order to have standing. Responding, HOME contends that it is an aggrieved person within the meaning of the Virginia Fair Housing Law and that Code § 36-96.1:1 specifically contemplates that fair housing organizations, such as HOME, would be permitted to seek redress in the courts for conduct which is proscribed by the Virginia Fair Housing Law. I agree with HOME.

In *Virginia Beach Beautification Commission*, this Court considered whether a beautification commission had standing at common law to challenge a board of zoning appeals' decision to grant a height and setback variance for the construction of a hotel. The commission was a non-stock Virginia corporation with a membership of over 400 persons and organizations, and its stated goal was " 'to help make and keep Virginia Beach one of the most beautiful cities in the state.' " *Virginia Beach Beautification Commission*, 231 Va. at 418, 344 S.E.2d at 902.

This Court observed that the commission was a person within the meaning of Code § 15.1-497 which provides that any "person" who is "aggrieved" by any decision of a board of appeals, "or any taxpayer," may present to the appropriate circuit court a petition for certiorari to review the decision. *Id.* This Court held, however, that the commission was not a person "aggrieved" within the meaning of Code § 15.1-497. Applying common law principles, this Court stated:

> "The term 'aggrieved' has a settled meaning in Virginia when it becomes necessary to determine who is a proper party to seek court relief from an adverse decision. In order for a petitioner to be 'aggrieved,' it must affirmatively appear that such person had some direct interest in the subject matter of the proceeding that he seeks to attack. *Nicholas* v. *Lawrence*, 161 Va. 589, 592, 171 S.E. 673, 674 (1933). The petitioner 'must show that he has an immediate, pecuniary and substantial interest in the litigation, and not a remote or indirect interest.' *Id.* at 593, 171 S.E. at 674."

231 Va. at 419, 344 S.E.2d at 902.

Our holding in *Virginia Beach Beautification Commission*, however, is simply not pertinent here. Code § 15.1-497,* unlike Code § 36-96.1:1 of the Virginia Fair Housing Law, does not contain a definition of the term "aggrieved person." The statutory definition of "aggrieved person" contained in Code § 36-96.1:1 is significantly different and less stringent than the word "aggrieved" that is discussed in *Virginia Beach Beautification Commission*. For example, the statutory definition of "aggrieved person" contained in Code § 36-96.1:1 refers to any person who *claims* to have been injured by a discriminatory housing practice or *believes* that such person will be injured by a discriminatory housing practice that is *about* to occur.

---

* Code § 15.1-497 has been recodified and is currently Code § 15.2-2314.

This standard is significantly different from our common law definition of "aggrieved" because at common law, a plaintiff is required to show more; a plaintiff is required to demonstrate that he has an immediate, pecuniary, and substantial interest in the litigation.

Under common law standing principles, a housing organization would not have standing to vindicate a violation of the Virginia Fair Housing Law because the common law required that the housing organization possess an immediate, pecuniary, and substantial interest in the litigation. Yet, the General Assembly amended the Fair Housing Law in 1991 to include a housing organization as "a person" within the meaning of that law.

Under the majority's holding, a fair housing organization such as HOME would never have standing to pursue a cause of action or administrative remedies under the Virginia Fair Housing Law because a housing organization could *never* incur an injury. Code § 36-96.1:1 defines an "aggrieved person" as any person who claims to have been injured by a discriminatory housing practice or believes that such person will be injured by a discriminatory practice that is about to occur. This Code provision also defines "person," among other things, as a fair housing organization.

Code § 36-96.4(A) prohibits an insurance company, such as Nationwide, from engaging in acts of racial discrimination in housing-related transactions. HOME, which is a fair housing organization and also a Virginia corporation, does not have a racial identity. Because HOME has no racial identity, under the majority's holding, HOME could never be injured within the meaning of the Virginia Fair Housing Law. Significantly, and most disturbing, the majority is unable to explain how a housing organization could ever have standing to pursue a claim under the Virginia Fair Housing Law.

The effect of the majority's construction of the word "injured" is to render meaningless the General Assembly's 1991 amendment of the Virginia Fair Housing Law to include housing organizations within the definition of "person." This Court has held that the General Assembly does not perform meaningless, useless, or vain acts when enacting legislation. This Court stated in *Natrella* v. *Board of Zoning Appeals*, 231 Va. 451, 461, 345 S.E.2d 295, 301 (1986) (quoting *Jones* v. *Conwell*, 227 Va. 176, 181, 314 S.E.2d 61, 64 (1984)):

" 'The rules of statutory interpretation argue against reading any legislative enactment in a manner that will make a portion

of it useless, repetitious, or absurd. On the contrary, it is well established that every act of the legislature should be read so as to give reasonable effect to every word and to promote the ability of the enactment to remedy the mischief at which it is directed.' "

*Accord Sims Wholesale Co.* v. *Brown-Forman Corp.*, 251 Va. 398, 405, 468 S.E.2d 905, 909 (1996); *RCC, Inc.* v. *Roanoke & Botetourt Tel. Co.*, 223 Va. 342, 347, 288 S.E.2d 478, 481 (1982); *Williams* v. *Commonwealth*, 190 Va. 280, 293, 56 S.E.2d 537, 543 (1949). By ignoring this basic principle of jurisprudence, the majority has effectively repealed those portions of the Virginia Fair Housing Law which relate to fair housing organizations such as HOME.

Furthermore, the majority's resort to the common law for a definition of "injury" is in direct conflict with Code § 36-96.1:1 of the Virginia Fair Housing Law. This statute permits a litigant to pursue a cause of action under the Virginia Fair Housing Law if the litigant *believes* that such litigant *"will be injured* by a discriminatory housing practice that is about to occur." *Id.* (Emphasis added). This statutory standard is less restrictive than the common law and, therefore, the common law cannot be used to provide a definition for the term "injured" because the Virginia Fair Housing Law expressly expands the scope of persons who can incur a legally cognizable injury. Thus, I would hold that in the very narrow context of the Virginia Fair Housing Law, the General Assembly, through its statutory definition of "aggrieved person," and its inclusion of fair housing organizations within the definition of "person," intended to relax the standing requirements so that fair housing organizations could use the courts to seek redress for certain types of discriminatory acts proscribed by the Virginia Fair Housing Law.

I also observe that Nationwide agreed in the circuit court that HOME would have standing under the Virginia Fair Housing Law under certain circumstances. The following dialogue appears in the record between the circuit court and HOME's counsel:

"The Court: My question again is, and maybe you didn't answer, maybe you missed it, but give me a situation in which HOME would have standing [under the Virginia Fair Housing Law] under your argument?

"[Counsel for Nationwide]: The way they would have standing is if they went on and did an investigation on a broad,

general basis. And as a result of that, they, something was suspicious to them and then diverted resources.

"The Court: They would have diverted resources from where? What resources are you talking about?

"[Counsel for Nationwide]: If they did something that did harm to one of their other functions."

Even under the theory that Nationwide advanced in the circuit court, HOME would have standing because as the evidence of record demonstrates, HOME undertook a broad investigation of 30 insurance companies and insurance agencies, and the results of that investigation indicated that Nationwide committed acts of racial discrimination in violation of the Virginia Fair Housing Law. Additionally, HOME did indeed divert resources from other programs so that it could document Nationwide's invidious acts of racial discrimination.

I would not permit Nationwide to assert a position in the circuit court in direct response to a question raised by that court and then seek to assert a different position on appeal. " '[P]arties litigant may not [take] inconsistent positions at different stages of . . . proceedings in court.' " *Commonwealth* v. *Lotz Realty Co.*, 237 Va. 1, 7, 376 S.E.2d 54, 57 (1989) (quoting *Kelley* v. *Commonwealth*, 140 Va. 522, 536, 125 S.E. 437, 441 (1924)).

I reiterate that I would not abandon, or retreat from, in any fashion, the common law standing principles which this Court discussed in *Virginia Beach Beautification Commission*. I would merely hold that when the General Assembly enacts a statute which prescribes a standard for standing which is less stringent than our common law standard, this Court must adhere to the statutorily-prescribed standard.

I recognize that HOME must still claim an injury or show that it was injured by a discriminatory housing practice that was about to occur. HOME presented evidence that it was injured within the meaning of Code § 36-96.1:1 because it expended thousands of dollars in resources to establish Nationwide's practices of racial discrimination against black homeowners. I also observe that the United States Supreme Court held in *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 379 (1982), that HOME had standing under the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* (1994), to pursue a claim for racial discrimination against an owner of an apartment complex because HOME had alleged that the apartment owner's acts of racial discrimination frustrated HOME's mission of promoting equal access to

housing and forced HOME to devote resources to identify and counteract such practice. The Supreme Court held that HOME's allegations that it had to devote significant resources to identify and counteract the apartment owner's acts of racial discrimination constituted a discrete and demonstrable injury to HOME. *Id. See also Ragin* v. *Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2nd Cir. 1993); *Hooker* v. *Weathers*, 990 F.2d 913, 915 (6th Cir. 1993); *Village of Bellwood* v. *Dwivedi*, 895 F.2d 1521, 1525-26 (7th Cir. 1990). In this case, HOME was required to devote additional financial resources to counteract Nationwide's racially-discriminatory conduct.

The fact that HOME was not aware of Nationwide's racially-discriminatory housing practices before HOME initiated its investigation has no legal relevance to the issue whether HOME has standing to pursue its cause of action. Rather, the appropriate inquiry is whether HOME was required to devote significant resources in its quest to successfully identify and counteract Nationwide's racially-discriminatory housing practices.

## IV.

### A.

Nationwide argues that the trial court erred "by allowing HOME to establish liability based on conduct that is not 'discrimination' under the Virginia Fair Housing Law." Continuing, Nationwide says that the "[Virginia Fair Housing Law] prohibits 'discriminat[ion] against any person in making available' a 'residential real estate-related transaction' or in the 'terms or conditions of such a transaction' " and that "[t]he trial court erred by allowing HOME to establish liability based on an alleged failure affirmatively to target [black] neighborhoods."

Nationwide's argument is meritless. HOME presented compelling evidence that Nationwide had intentionally engaged in acts of racial discrimination in selling homeowners' insurance in the City of Richmond. HOME's evidence demonstrated that Nationwide applied more stringent requirements to black homeowners who sought to acquire homeowners' insurance. The evidence also revealed that Nationwide applied one set of criteria when deciding to issue homeowners' insurance to white property owners in predominantly white communities, but yet applied a different set of criteria to black property owners who lived in predominantly black neighborhoods. Nationwide's agents admitted in court that they lied to HOME's black testers when

those testers called to receive quotes for homeowners' insurance from Nationwide's agents. Nationwide also used race in its marketing plan.

HOME did not seek to require that Nationwide undertake "affirmative race-based marketing or advertising" as Nationwide claims. Rather, HOME demonstrated, with powerful and persuasive evidence, that Nationwide used race as a factor in its decisions whether to grant homeowners' insurance to black homeowners who live in black neighborhoods in Richmond.

## B.

Nationwide contends that the circuit court "erred by allowing HOME to establish liability under the Fair Housing Law on the theory that Nationwide lobbied the United States Congress regarding the scope of the federal Fair Housing Act." Nationwide says that its lobbying activities were not relevant to the alleged violation of the Virginia Fair Housing Law and that its free speech is protected by the Virginia and federal constitutions. Continuing, Nationwide states that although it "moved before trial to exclude any reference to such lobbying . . . the [circuit] court denied the motion . . . HOME took full advantage of that ruling, emphasizing in its opening statement that Nationwide, 'after it became aware that it was ignoring minority neighborhoods . . . spent significant amounts of time trying to convince Congress . . . that it was not subject to the anti-discrimination laws that Congress had passed, instead trying to fix the problem.' " Nationwide's contentions are without merit.

My review of the record indicates that Nationwide made this inquiry relevant when Nationwide, during its cross-examination of HOME's executive director, Chamberlin, challenged whether HOME had any specific complaints or evidence that Nationwide had denied insurance to black homeowners on the basis of race when HOME sought federal funds to finance its examination of racially-disparate practices in the homeowners' insurance industry in central Virginia. During HOME's redirect examination of Chamberlin, the following dialogue occurred:

"Q: Finally, Ms. Chamberlin, a number of questions were asked you about whether you had specific complaints about Nationwide agents prior to applying for and receiving the [federal] grant or filing this lawsuit. Do you remember those questions?

"A: Yes, I do.

"Q: What else — and you answered those questions. What else did HOME know or had HOME heard about Nationwide prior to filing for the [federal] grant?

"A: Well, we knew that they had . . .

"[Counsel for Nationwide]: I would ask that the witness be required to establish a foundation as to how they knew what they knew.

"The Court: Overruled. And I will see what the answer is, but same admonition. This goes only to Ms. Chamberlin's thought processes and the reasons HOME did what they did, not for the truth of anything that I think she's getting ready to tell you. Go ahead.

"[Counsel for HOME]: Ms. Chamberlin, what did HOME know, or what had HOME heard concerning Nationwide prior to the filing of this lawsuit?

"A: We knew that the National Fair Housing Alliance had done testing of Nationwide in about 10 cities across the country, and that they had filed a complaint with the Department of Housing and Urban Development. We knew that there had been a complaint against Nationwide filed in Toledo, alleging differential treatment and underwriting standards which had a disparate impact on African Americans. We knew that Nationwide, in about 1996, had attempted to eliminate the funding for fair housing investigations of homeowners['] insurance from HUD."

As the above dialogue indicates, the circuit court permitted Chamberlin to testify about the reasons HOME decided to examine Nationwide's homeowners' insurance marketing practices. This line of inquiry was appropriate because Nationwide's own attorney raised this subject on direct examination. The trial court did not admit the testimony for "the truth of anything," but limited the testimony as evidence of HOME's executive director's thought processes. The circuit court's ruling in no way impaired any federal or state constitutional rights that Nationwide may have to lobby national or state legislative bodies. Indeed, Nationwide "opened the door" to the very inquiry of which it now complains.

## C.

Nationwide argues that the compensatory damage award of $500,000 is improper. Nationwide says that the award consists of two distinct components, $56,000 for HOME's investigation and pre-litigation expenses and $444,000 for unspecified frustration of mission. Continuing, Nationwide argues that HOME did not sustain an injury and that there is no evidentiary foundation for the award of compensatory damages. I disagree with Nationwide's contentions.

This Court has held that damages must be proved with reasonable, but not absolute, certainty. *Oden* v. *Salch*, 237 Va. 525, 535, 379 S.E.2d 346, 352 (1989); *Gwaltney* v. *Reed*, 196 Va. 505, 507-08, 84 S.E.2d 501, 502 (1954). The jury's award of compensatory damages must be based upon the evidence and not left to speculation. However, a litigant is not required to prove damages with absolute certainty and is only required to place before the jury " 'all the facts and circumstances of the case having any tendency to show damages, or their probable amount, so as to enable [the jury] to make the most intelligible and probable estimate which the nature of the case will admit.' " *Oden*, 237 Va. at 536, 379 S.E.2d at 352 (quoting *Southern Railway Co.* v. *McMenamin*, 113 Va. 121, 129, 73 S.E. 980, 982 (1912)); *accord National Energy Corp.* v. *O'Quinn*, 223 Va. 83, 90, 286 S.E.2d 181, 185 (1982).

I would hold that HOME presented the jury with evidence that is sufficient to support the jury's award of compensatory damages. HOME presented evidence from which the jury could infer that HOME suffered damages within the meaning of the Virginia Fair Housing statute as a result of Nationwide's invidious acts of racial discrimination. HOME's executive director testified that HOME expended $150,000 of "in-kind" resources associated with its efforts to document Nationwide's racially-discriminatory practices.

Moreover, the jury was instructed with a general verdict, as required by our precedent. Therefore, Nationwide's suggestion of the method by which the jury arrived at its verdict is mere speculation and cannot be used as a basis to disturb the verdict that has been confirmed by the circuit court.

## V.

## A.

Nationwide argues that the jury's award of $100,000,000 in punitive damages is legally improper. First, Nationwide argues that

HOME failed to establish that it is entitled to any award of punitive damages. Continuing, Nationwide asserts that the award of $100,000,000 in punitive damages is grossly excessive and disproportionate. Responding, HOME asserts that it proved Nationwide had engaged in intentional and willful racial discrimination and that the jury's award of punitive damages is not excessive.

Nationwide's assertion that HOME failed to establish that it is entitled to any award of punitive damages is meritless. Code § 36-96.18(C) of the Virginia Fair Housing Law, states in relevant part: "In a civil action under [this statute], if the court or jury finds that a discriminatory housing practice has occurred or is about to occur, the court or jury may award to the plaintiff, as the prevailing party, compensatory and punitive damages, without limitation otherwise imposed by state law, and the court may award reasonable attorney's fees and costs . . . ."

This Court has repeatedly held that "an award of punitive damages is not favored generally because punitive damages are in the nature of a penalty and should be awarded only in cases involving the most egregious conduct." *Bowers* v. *Westvaco Corp.*, 244 Va. 139, 150, 419 S.E.2d 661, 668 (1992); *Owens-Corning Fiberglas Corp.* v. *Watson*, 243 Va. 128, 144, 413 S.E.2d 630, 639 (1992); *Philip Morris, Inc.* v. *Emerson*, 235 Va. 380, 407, 368 S.E.2d 268, 283 (1988); *see Simbeck, Inc.* v. *Dodd Sisk Whitlock Corp.*, 257 Va. 53, 58, 508 S.E.2d 601, 604 (1999). A plaintiff who seeks an award of punitive damages against a defendant must present evidence that the defendant's acts were " 'so willful or wanton as to evince a conscious disregard of the rights of others, as well as malicious conduct . . . .' " *Bowers*, 244 Va. at 150, 419 S.E.2d at 668 (quoting *Booth* v. *Robertson*, 236 Va. 269, 273, 374 S.E.2d 1, 3 (1988)).

This Court has stated that

> " '[i]n order that one may be guilty of wilful or wanton conduct, it must be shown that he was conscious of his conduct, and conscious, from his knowledge of existing conditions, that injury would likely or probably result from his conduct, and that with reckless indifference to consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the injurious result.' "

*Infant C.* v. *Boy Scouts of America, Inc.*, 239 Va. 572, 581, 391 S.E.2d 322, 327 (1990) (quoting *Thomas* v. *Snow*, 162 Va. 654, 660,

174 S.E. 837, 839 (1934)); *Bowers*, 244 Va. at 150, 419 S.E.2d at 668.

I would hold that in view of the evidence contained in Part II.B. of this dissent, HOME presented sufficient evidence which would support an award of punitive damages. Simply stated, HOME presented evidence which would permit a jury to find that Nationwide, through the use of its marketing strategies and practices, engaged in willful acts of racial discrimination which evinced a conscious disregard of the rights of black property owners who resided in black neighborhoods in the City of Richmond. I need not repeat the facts which support this finding.

### B.

I now consider whether the jury's award of $100,000,000 in punitive damages is excessive. The issue whether a jury's award of punitive damages is excessive is a legal question. *Bassett Furniture Industries* v. *McReynolds*, 216 Va. 897, 913, 224 S.E.2d 323, 333 (1976). Additionally, this Court has stated:

> " '[I]t is an ancient and accepted doctrine of the common law, that judges have the power and are clearly charged with the duty of setting aside verdicts where the damages are either so excessive or so small as to shock the conscience and to create the impression that the jury has been influenced by passion or prejudice, or has in some way misconceived or misinterpreted the facts or the law which should guide them to a just conclusion.' "

*Id.* at 912 n.*, 224 S.E.2d at 333 n.*.
We have also stated that:

> "Ordinarily, a damage award fixed by a jury after a properly conducted trial and approved by the trial judge is held to be inviolate against disturbance by the appellate court. There is no rigid standard for measuring punitive damages; the amount of such an award is largely a matter within the discretion of the fact finder."

*Hamilton Development Co.* v. *Broad Rock Club*, 248 Va. 40, 45-46, 445 S.E.2d 140, 144 (1994) (citations omitted).

In *Philip Morris, Inc.*, 235 Va. at 414, 368 S.E.2d at 287, this Court adopted the standard of appellate review for punitive damages

that it previously adopted for compensatory damages in *Modaber* v. *Kelley*, 232 Va. 60, 348 S.E.2d 233 (1986). In *Modaber*, this Court held that an appellate court must declare a verdict excessive and rule that the circuit court had abused its discretion in refusing to set the verdict aside

> "whenever the size of the award shocks the conscience of the Court and creates the impression that the jury was biased in favor of the plaintiff or prejudiced against the defendant or has misconceived or misunderstood the facts or the law, or if the award is so out of proportion to the plaintiff's [damages] as to suggest that it is not the product of a fair and impartial decision."

232 Va. at 69, 348 S.E.2d at 238.

Applying the standard, I would hold that the jury's award of punitive damages in the amount of $100,000,000 is so excessive as to shock the conscience of this Court. I fully recognize that racial discrimination is odious and that no citizen, irrespective of his or her race, should be required to suffer the humiliation and indignities associated with such discrimination. I also recognize that HOME presented evidence which would support the jury's finding that Nationwide committed intentional and pervasive acts of racial discrimination. However, the jury's award of punitive damages against Nationwide is 200 times the amount of the jury's award of $500,000 in compensatory damages. Even though the jury's punitive damage award of $100,000,000 represents a small amount of Nationwide's policyholder surplus of $9.1 billion, the magnitude of the award nonetheless remains shocking to the conscience of this Court. Therefore, I would hold that the circuit court erred in failing to set aside the jury's award of punitive damages and order a new trial on that issue.

## VI.

I have reviewed Nationwide's remaining arguments, and they are without merit. For the foregoing reasons, I would affirm that portion of the circuit court's judgment which approved the jury's award of $500,000 in compensatory damages to HOME. I would reverse that portion of the judgment which confirmed the jury's award of punitive damages, and I would remand this case to the circuit court for a new trial on the amount of punitive damages that should be assessed against Nationwide.