Tonya **MOSEKE, et al., Plaintiffs,**

v.

**MILLER AND SMITH, INC., et al., Defendants.**

No. Civ.A. 01–1771–A.

United States District Court, E.D. Virginia, Alexandria Division.

May 17, 2002.

Pragna Soni, Ross, Dixon & Bell, Eliza Tamsin Platts–Mills, Washington Lawyers' Committee for Civil Rights & Urban Affairs, Washington, DC, for plaintiffs.

John M. Bredehoft, Venable, Baeter and Howard, Vienna, Virginia, Mark Patrick Graham, Rees Broome & Diaz, Vienna, VA, Wilbert Washington, II, Chadwick, Washington, Olters, Moriarty & Lynn, Fairfax, VA, Michael L. O'Reilly, Rees Broome & Diaz, Vienna, Virginia, VA, for defendants.

### MEMORANDUM OPINION

LEE, District Judge.

THIS MATTER is before the Court on Defendants' Motion to Dismiss Plaintiffs' Complaint under FED.R.CIV.P. 12(b)(1) and 12(b)(6). The individual plaintiff, Tonya Moseke ("Moseke") a person with a disability, and the organizational plaintiff, the Equal Rights Center ("ERC"), contend that when Moseke sought an apartment in the Northern Virginia vicinity she encountered illegal barriers to her access at Defendants' various housing complexes, in violation of both the Federal Fair Housing Act ("FHA") and the Virginia Fair Housing Law ("VFHL"). Defendants ·are

builders, architects and condominium associations who assert that: (1) the organizational plaintiff's diversion of resources to litigate this matter does not constitute an Article III injury and therefore ERC has no standing in this matter; (2) Plaintiffs' Complaint is untimely because the statute of limitations expired two years after the buildings were constructed; (3) the Eton Square Condominium Association ("ESCA") development was completed prior to the effective date of both the FHA and the VFHL; and (4) Plaintiffs' Complaint does not support a claim for punitive damages.

The primary issues before this Court are: (1) whether the organizational plaintiff, ERC, has standing in this action under Rule 12(b)(1) because it has suffered a minima of injury in fact; and (2) whether the inaccessible features of a FHA non-compliant building are a continuing violation that tolls or extends the statute of limitations under Rule 12(b)(6).

As to the first question, this Court finds that the organizational plaintiff, ERC, has standing in this action. At this stage in the litigation, ERC has alleged facts that if true demonstrate a palpable injury to the organization. ERC has adequately alleged a substantial diversion of its limited resources to address the Defendants' alleged discriminatory practices.

Second, as to the statute of limitations issue, this Court concludes that Plaintiffs' design and construction claim is effectively time-barred. In reaching this conclusion, this Court considers the plain meaning of the FHA time limitation provision as well as Supreme Court precedent and other authority governing the continuing violation doctrine. Because Defendants performed no act within two years preceding the filing of the Complaint, the continuing violation doctrine is inapplicable. Similarly, the discovery doctrine is unavailing because the plain language of the FHA statute provides that it is either the *occurrence* of a housing practice or the *termination* of a continuing housing practice that triggers the statute of limitations, not the plaintiff's discovery of the alleged wrongdoing.

The Court does not reach the third and fourth grounds of Defendants' motion to dismiss, specifically whether the FHA applies to the ESCA development and whether Plaintiffs sufficiently pled punitive damages, respectively, because resolution of the statute of limitations issue is dispositive in this matter with respect to the moving Defendants. However, the case is not dismissed in its entirety because Plaintiff Moseke still retains a reasonable accommodations claim against Defendant Eton Square Condominium Association. To be clear, the motion to dismiss is granted only so far as Plaintiffs' design and construction claim. Since Plaintiff ERC's claim is based solely on the design and construction allegations, ERC's claim is dismissed. Further, since Defendant Baldwin Grove has yet to file a motion in this matter, it still remains a defendant in this case.

# I. BACKGROUND

Plaintiffs, Moseke and the ERC (collectively "Plaintiffs"), filed a complaint against eleven Defendants in this Court,[1]

---

1. The eleven Defendants are: 1) Miller and Smith, Inc; 2) Miller and Smith Holding, Inc; 3) Miller and Smith Land, Inc; 4) Miller and Smith Commercial Properties, Inc.; 5) Miller and Smith Homes, Inc.; 6) BC Consultants, Inc ("BC"); 7) Christopher Consultants, Ltd. ("Christopher"); 8) Kingstowne Residential Owners Corporation ("KROC"); 9) Gates at West Falls, A Condominium Association, Inc. ("GWFCA"); 10) Baldwin Grove, A Condominium Association, Inc. ("BGCA"); and 11) Eton Square Condominium Association, Inc.

alleging disability discrimination violations under the Federal Fair Housing Act ("FHA"), 42 U.S.C. § 3601 (2000), *et seq.*, and the Virginia Fair Housing Law ("VFHL"), Va.Code Ann. § 36–96.1 (2000), *et seq.*, respectively.[2] Plaintiffs specifically allege non-compliance with the FHA design and construction statutory provision, 42 U.S.C. § 3604(f)(3)(C), as well as a violation of the FHA reasonable accommodation provision, 42 U.S.C. § 3604(f)(3)(A). Of these eleven Defendants, seven are either developers or architectural firms, while four are condominium associations.

In the summer of 1999, Moseke sought an apartment in Northern Virginia. Moseke has juvenile rheumatoid arthritis which requires her to use a motorized scooter. After viewing the ESCA development, Moseke determined that the exterior premises would not facilitate the use of her motorized scooter. In June 1999, Moseke consulted with the ERC regarding her options. The ERC is a nonprofit civil rights advocacy group that seeks to protect civil rights, including disability rights, through educational, counseling, and referral services, as well as litigation, in the greater Washington D.C. metropolitan area. Based on her consultation with the ERC, Moseke sought a reasonable accommodation from Defendant ESCA, namely a des-

ignated handicapped parking place and a ramp to her front door. At some unspecified time between June 1999 and January 2000, however, ESCA allegedly refused Moseke's request.[3]

Based on ESCA's refusal of a reasonable accommodation, Moseke filed a complaint with the ERC in January 2000. Subsequently, the ERC conducted multiple investigations of Defendant ESCA, as well as two other developments built by Defendants Miller and Smith: Defendant Baldwin Grove Condominium Association ("BGCA") and Defendant Gates at West Falls Condominium Association ("GWFCA"). Between March and August 2000, the ERC determined that all three complexes had both exterior and interior FHA violations through the use of multiple investigative tester teams.[4] The ERC testers visited the three developments and observed exterior violations including lack of handicapped designated parking spaces and lack of curb cuts. Additionally, the ERC testers observed that all three developments had interior violations including environmental controls that were positioned too high and doorways that were too narrow.

Plaintiffs filed the instant Complaint on November 19, 2001. Defendants now

("ESCA"). The five Miller and Smith Defendants filed the present Motion to Dismiss. Four additional Defendants (BC, Christopher, KROC and GWFCA) joined in that motion. The moving defendants will be referred to collectively as the "Defendants." Two of those Defendants (KROC and GWFCA) filed separate 12(b)(6) Motions to Dismiss. Two Defendants (ESCA and BGCA) have filed no motions whatsoever. On February 6, 2002, a consent order was entered relieving GWFCA from any further participation in this case pending the Court's subsequent determination of any remedial relief affecting GWFCA. On March 7, 2002, the Court entered a stipulation and final order granting KROC's 12(b)(6) motion and dismissing KROC from this case.

2. The VHFL largely tracks the language of the FHA. Therefore, the analysis and holdings as to the FHA are equally applicable to the Plaintiffs' VHFL claims unless otherwise explicitly noted.

3. Plaintiffs' Complaint does not allege when ESCA refused Moseke's request for a reasonable accommodation.

4. Between June and July 2001, a second team of investigative ERC testers observed similar interior and exterior FHA violations at all three condominium developments.

move this Court to dismiss all or portions of Plaintiffs' Complaint under FED. R.CIV.P. 12(b)(1) for ERC's lack of standing. Defendants additionally move this Court to dismiss all or part of Plaintiffs' Complaint under FED.R.CIV.P. 12(b)(6) contending that: 1) the expiration of the statute of limitations;[5] 2) the ESCA development was completed prior to the effective date of the federal and Virginia FHA; and 3) Plaintiffs' Complaint does not support a claim for punitive damages.

## II. ANALYSIS

### A. Standing.

#### 1. Standard of review.

The Court first turns to the issue of whether the organizational plaintiff, ERC, has Article III standing. *See Jones v. Am. Postal Workers Union,* 192 F.3d 417, 422 (4th Cir.1999) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (explaining that court must first consider jurisdictional questions such as standing before reaching other issues presented)). Defendants contend that the Court lacks subject matter jurisdiction over ERC's claim because ERC has not pled a cognizable Article III injury.

"For purposes of ruling on a motion to dismiss for want of standing, [the court] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Pacific Legal Foundation v. Goyan,* 664 F.2d 1221, 1223 (4th Cir.1981) (quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). *See also Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982) (citations omitted) (when a defendant contends that the complaint fails to allege facts upon which subject matter jurisdiction may be based, "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration.") Plaintiff bears the burden of proving subject matter jurisdiction. *See Thomson v. Gaskill,* 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951 (1942).

#### 2. Standing under the Fair Housing Act.

The primary issue between the parties is whether the injury alleged by the organizational plaintiff ERC is sufficient to satisfy Article III standing.[6] The question of standing requires the Court to determine "whether the litigant is entitled to have the Court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential

---

**5.** In their motion, Defendants move this Court to dismiss Plaintiffs' Complaint for expiration of the statute of limitations under FED. R.CIV.P. 12(b)(1). This, however, is not the law. An expiration of the statute of limitations is properly analyzed under a FED. R.CIV.P. 12(b)(6) standard. *See Gordon v. Nat'l Youth Work Alliance,* 675 F.2d 356, 360 (D.C.Cir.1982).

**6.** Courts generally recognize two types of organizational standing: representative and first party. *See* Dash T. Douglas, *Standing On Shaky Ground: Standing Under The Fair Housing Act,* 34 Akron L.Rev. 613, 624 (2001).

In the representational category, an organization may have standing to sue on behalf of its members. *See, e.g., Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1975) (discussing pre-requisites for organizational standing on basis of members having standing to sue in their own right). As a first party, however, an organization has standing to sue on its own behalf based on the injury it has suffered. *See Havens,* 455 U.S. at 379, 102 S.Ct. 1114. It is the first party organizational standing which is at issue here.

limitation on its exercise...." *Warth,* 422 U.S. at 498, 95 S.Ct. 2197.

■ Under the FHA, an aggrieved person is defined as "any person who claims to have been injured by a discriminatory housing practice." 42 U.S.C. § 3602(i)(1).[7] The Supreme Court has made clear that standing under the FHA is "not limited by prudential principles." *Saunders v. Gen. Servs. Corp.,* 659 F.Supp. 1042, 1051 (E.D.Va.1987) (citing *Trafficante v. Metropolitan Life Insur. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)). *See also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Congress eliminated the prudential barriers to confer standing in suits brought pursuant to the FHA to the fullest extent possible by Article III. *See Havens,* 455 U.S. at 372, 102 S.Ct. 1114 (quoting *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 103, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). As the Supreme Court explained in *Havens,* "the sole requirement for standing to sue under [the FHA] is the Article III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered a 'distinct and palpable injury.'" 455 U.S. at 372, 102 S.Ct. 1114 (quoting *Warth,* 422 U.S. at 501, 95 S.Ct. 2197).

In *Havens,* defendants' discriminatory actions involved steering potential black tenants away from the defendants' apartment buildings. 455 U.S. at 367, 102 S.Ct. 1114. The housing organizational plaintiff brought suit alleging that the defendants' practices frustrated "its efforts to assist equal access to housing through counseling and other referral service." *Id.* at 379, 102 S.Ct. 1114. The organizational plaintiff alleged that it had to "devote significant resources to identify and counteract the defendants racially discriminatory practices." *Id.*

The Supreme Court found that because the defendants' steering practices "perceptibly impaired [the organizational plaintiff's] ability to provide counseling and referral services" there was no doubt that the organization had suffered an injury in fact. *Havens,* 455 U.S. at 379, 102 S.Ct. 1114. The *Havens* Court deemed that this impairment, which caused a drain on the organization's resources, constituted a "concrete and demonstrable injury" sufficient to grant the organizational plaintiff standing. *Id.*

Since *Havens,* the circuit courts have struggled with the injury in fact organizational standard under the FHA. *See* Douglas, 34 AKRON L.REV. at 626 (collecting cases). On one side of the ledger lie the Second, Sixth, and Seventh Circuits who have all found that the diversion of an organization's resources to counteract discriminatory practices is a palpable injury, even if such expenditures include litigation costs. *See Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 905 (2d Cir.1993) (holding that organization had standing where it devoted significant resources to identify and combat defendant's alleged discriminatory advertising practices, including preparation of lawsuit itself); *Hooker v. Weathers,* 990 F.2d 913, 915 (6th

---

7. Defendants cite *Nationwide Mutual Ins. Co. v. Hous. Opportunities Made Equal, Inc.,* 259 Va. 8, 523 S.E.2d 217 (2000), to support the proposition that ERC has not alleged sufficient injury to establish standing under the VFHL. However, that opinion was withdrawn when rehearing was granted by the Supreme Court of Virginia. *See Nationwide Mutual Ins. Co. v. Hous. Opportunities Made Equal, Inc.,* No. 990733, 2000 Va. LEXIS 56, at *1 (Va. March 3, 2000). Therefore, *Nationwide Mutual* is of no precedential value. The VFHL closely tracks the language in the FHA statute. In the absence of a decision from the Virginia Supreme Court regarding the VFHL, this Court will apply its standing analysis under the FHA with equal force to the Plaintiff's standing under the VFHL.

Cir.1993) (finding that organization had standing where it devoted resources to investigating the defendants' practices alleged in plaintiff's complaint); *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1525 (7th Cir.1990) ("the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination.")

Although the Fourth Circuit has yet to address the issue, a few district courts in this circuit have held that the diversion of resources approach is sufficient to show organizational standing under the FHA. *See Williams v. Poretsky Mgmt. Inc.*, 955 F.Supp. 490, 493 (D.Md.1996) (considering organization's litigation expenditures along with other diversion of resources in identifying and counteracting defendant's practices sufficient to demonstrate standing); *Saunders*, 659 F.Supp. at 1052 (same). These courts have concluded that *Havens* recognizes standing where an organization alleges a considerable expenditure of resources, which can include expenditures on litigation to combat a defendant's discriminatory practices because such a diversion amounts to a "concrete and demonstrable injury to the organization's activities." *Saunders*, 659 F.Supp. at 1051–52.

Conversely, the District of Columbia, Third, and Fifth Circuits have held that for an organization to show the requisite injury, it must demonstrate an expenditure of resources independent of the lawsuit.

*See Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C.Cir.1994) (finding that expense of testing was a "self-inflicted" harm resulting from organization's budgetary choices rather than defendant's actions); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.), *cert. denied*, 498 U.S. 980, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990) (holding that standing requires organization to allege devotion of resources to activities other than litigation costs); *Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78–80 (3d Cir.1998) (agreeing with D.C. Circuit's conclusion that "litigation expenses alone do not constitute damage sufficient to support standing."); *Assoc. for Retarded Citizens v. Dallas Cty. Mental Health and Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir.1994) (redirection of resources to litigation in response to actions or inactions of other party insufficient to impart standing on organization). These courts have reasoned that basing standing solely on a self-inflicted injury such as testing would enable any organization to assert an Article III injury merely by expending resources on litigation. *See, e.g., Fair Employment Council*, 28 F.3d at 1276–78.

To the extent that these two approaches conflict,[8] this Court adopts the broader reading of *Havens* as set forth in *Williams*, 955 F.Supp. 490. Relying on case law drawn from both camps outlined

---

8. The two approaches are not necessarily diametrical opposites. For instance, although the Third Circuit in *Fair Housing Council* expressly declined to follow the Seventh Circuit's broader reading of *Havens* in *Bellwood*, the Third Circuit explained that the holding in *Bellwood* "was *not* that litigation alone constituted injury sufficient to convey standing." *Fair Housing Council*, 141 F.3d at 80 n. 7 (emphasis in original). Rather, the *Fair Housing Council* court pointed out that the institutional plaintiff in *Bellwood* undertook a bona fide investigation of a number of agencies who engaged in racial steering. *See Id.* In other words, *Bellwood* and other circuit decisions finding standing under the FHA based on diversion of resources, including legal expenditures, can be reconciled with *Fair Housing Council* and other cases setting forth a "litigation plus" formulation of organizational standing.

above, the *Williams* court formulated a standing rule for organizations under the FHA. *See id.* at 493–94 (citing *Spann*, 899 F.2d at 27; *Saunders*, 659 F.Supp. at 1052; *Ragin*, 6 F.3d at 905; and *Bellwood*, 895 F.2d at 1526). The *Williams* court held that an organization has standing under the FHA when it has "(1) devoted significant resources to identifying and counteracting the defendant's discriminatory practice; and (2) such practices have frustrated the organization's efforts against discrimination." *Williams*, 955 F.Supp. at 495 (citing *Saunders*, 659 F.Supp. at 1052). Importantly, *Williams* recognized that time and money spent investigating the defendants' practices did not negate standing simply because such resources were related to the development of the lawsuit. *See id.* The investigation of the practices "can be regarded as an independent activity associated with the identification and counteraction of the defendants' discriminatory practices." *Id.* (citing *Ragin*, 6 F.3d at 905; *Bellwood*, 895 F.2d at 1526).

This Court finds that the standard enunciated in *Williams* is a balanced approach consistent with *Havens'* central teaching—organizational standing requires that the alleged discriminatory practices have "perceptibly impaired" the institution's efforts against discrimination. *See Havens*, 455 U.S. at 379, 102 S.Ct. 1114. The *Williams* standard is also in line with the Supreme Court's definition of standing under the FHA to reach the fullest limits of Article III. *See Trafficante*, 409 U.S. at 211, 93 S.Ct. 364. Similarly, it promotes Congress' intent to place enforcement of the values instilled in the FHA in the hands of private attorney generals like the Plaintiffs in this case. *See Spann*, 899 F.2d at 30.

### 3. Application to ERC.

■ Applying *Williams'* refinement of the *Havens'* standard, the Court holds that the ERC has standing to bring this action. The ERC is an organization that "engages in activities to identify barriers to fair housing and to help counteract and eliminate discriminatory housing practices. In support of its goals, the ERC engages in a variety of educational, counseling, and referral services, as well as community monitoring activities, throughout the greater Washington area." (Pls.' Compl. ¶ 11). ERC alleges that Defendants have "directly and substantially injured and frustrated" ERC's mission and its efforts to carry out the programs and services it provides, such as education and counseling. (*Id.* ¶ 63). ERC claims that it "has been damaged by having to divert scarce resources that could have been used to provide these services to identify and counteract Defendants' discriminatory polices and practices." (*Id.*)

Specifically, the Complaint details the efforts ERC expended to identify Defendants' alleged discriminatory acts. The ERC first advised and counseled Moseke, the individual plaintiff, regarding her options to address the inaccessibility of the ESCA. (*Id.* ¶ 25). After Moseke's request for a reasonable accommodation was allegedly rebuffed, the ERC undertook an investigation of ESCA and allegedly discovered other impairments. (*Id.* ¶¶ 28–30). This investigation entailed two rounds of testers who surveyed the exterior and interior features of various units in five of the buildings of the ESCA complex. (*Id.* ¶¶ 29–37). Based on these initial findings, ERC sent rounds of testers to investigate other complexes developed by the Defendant Miller and Smith—Baldwin Grove and Gates of West Falls—allegedly finding similar violations. (*Id.* ¶¶ 40, 44–49, 54–59).

At this stage in the litigation, ERC has alleged facts that demonstrate a palpable

injury to itself.[9] ERC has alleged that it devoted "significant resources to identify and counteract" the Defendants' practices and did so "to the detriment of their 'efforts to obtain equal access to housing through counseling and other referral services.'" *Ragin,* 6 F.3d at 905 (quoting *Havens,* 455 U.S. at 379, 102 S.Ct. 1114; *Bellwood,* 895 F.2d at 1526). The fact that these efforts, specifically the counseling services and the use of testers, may have produced evidence that is ultimately necessary to ERC's litigation does not negate its standing in this case. "In *Havens,* certainly the testers' activities provided necessary evidence to form the basis for HOME's lawsuit, but such activities were still relevant in establishing standing." *Saunders,* 659 F.Supp. at 1052. *See also Hooker,* 990 F.2d at 915 (finding standing where organization "devoted resources to investigating the defendant's practices" by sending tester to inquire about defendants' housing facilities); *Ragin,* 6 F.3d at 905 (fact that some of plaintiff's "staff's time was spent exclusively on litigating this action does not deprive the organization of standing to sue in federal court.") (citing *Saunders,* 659 F.Supp. at 1052).

The resources expended on counseling Moseke, processing her complaint, and investigating the various complexes, although "related to the development of the lawsuit ... can also be regarded as [ ] independent activit[ies] associated with the identification and counteraction of the defendants' discriminatory practices." *Williams,* 955 F.Supp. at 493 (citations omitted). These efforts can stand alone and could further the ERC's mission without ultimately resulting in litigation. ERC's efforts could have resulted in settlement between the parties before the filing of a complaint. For instance, a reasonable accommodation could have been made to Moseke. Therefore, the case at bar is different from cases like *Assoc. for Retarded Citizens,* where the Fifth Circuit found that litigation expenses alone were insufficient. 19 F.3d at 243. ERC has pled more than just litigation costs. Accordingly, Defendants' motion to dismiss for want of standing is denied.

### B. Statute of Limitations.

Defendants also move to dismiss the Complaint on the ground that Plaintiffs' construction and design claim was not timely filed within the FHA's two year statute of limitations period.[10] As dis-

---

9. The instant motion is a motion to dismiss, not one for summary judgment. Even courts that have applied a stricter reading of *Havens'* standing requirement have found that allegations that simply track *Havens'* allegations of injury are sufficient to withstand a motion to dismiss. *See, e.g., Fair Hous. Council,* 141 F.3d at 76 (noting that housing organization's damage allegations "tracked *Havens* language and were sufficient to withstand a motion to dismiss, [however] something more than naked allegations was required at summary judgment stage.") Therefore, Defendants' reliance on cases such as *Louisiana ACORN Fair Hous. v. LeBlanc,* 211 F.3d 298 (5th Cir.2000), a case decided on summary judgment focusing on whether the plaintiffs provided sufficient evidence to support standing, is misplaced.

10. In general, a statute of limitations essentially serves to preserve evidence associated with an alleged act as well as to discourage a potential plaintiff from sitting on his or her rights. *See United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). *See also,* James R. MacAyeal, *The Discovery Rule and the Continuing Violation Doctrine as Exceptions to the Statute of Limitations for Civil Environmental Penalty Claims,* 15 Va.Envtl.L.J. 589, 590–92 (1996). Typically, the alleged defendant's wrongful act triggers the statute of limitations. *See* MacAyeal, 15 Va.Envtl.L.J. at 594. Courts have applied two narrow doctrines, however, to extend or toll the time permitted by the statute of limitations. These two doctrines are the continuing violation rule and the discovery rule. *See id.* at 589. Under the continuing violation doctrine, a plain-

cussed in detail below, the Court agrees. The Court begins its analysis with the plain language of the statute, which requires an act, whether as the last in a series or a single occurrence, within the two year limitations period. Second, the Court canvasses the case law concerning the continuing violation doctrine and how courts have applied it in analogous contexts. The Court next discusses the differences between the continuing violation doctrine and continuing effects, which courts have declined to rely on to extend the statute of limitations. Finally, the Court applies the plain language of the FHA and precedent to the instant case to find that Plaintiffs' Complaint is barred by the FHA's statute of limitations because they do not allege any discriminatory act within the limitations period. The Court also concludes that the discovery doctrine is inapplicable.

### 1. Standard of review.

█ A motion to dismiss based on the expiration of the statute of limitations is analyzed under Rule 12(b)(6). *See Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 360 (D.C.Cir.1982) (citing 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1277 (1969)). *Accord Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir.1989) (same). *Cf. Rector v. Approved Fed. Sav. Bank*, 265 F.3d 248, 252 (4th Cir.2001) (holding that "[a] statute of limitations requires a litigant to file a claim within a specified period of time [but a] litigant's untimely filing does not preclude the court from addressing the claim; the court does not lack jurisdiction [and may] address the claim,

limited only by the defendant's assertion of a statute of limitations defense. Moreover, [unlike a jurisdictional issue] the defendant may waive the defense by failing to raise it.")

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may granted, a court must accept the facts pled by the plaintiff as true and construe them in the light most favorable to the plaintiff. *See Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 991 F.2d 94, 97 (4th Cir.1992). "The court should not dismiss the claim unless it appears to a certainty that the plaintiff can prove no facts in support of his claims which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Bruce v. Riddle*, 631 F.2d 272, 273–74 (4th Cir. 1980). The only facts that the court may consider in a Rule 12(b)(6) motion to dismiss are those asserted within the plaintiff's complaint. *See Dickey v. Greene*, 729 F.2d 957 (4th Cir.1984) (en banc). *See also*, 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1363 (2d ed.1990).

Defendants contend that the design and construction of a building is a process that is not continuing in nature, but rather is concluded at the end of construction. Furthermore, Defendants argue that the continuing effects of a design and construction process do not constitute a continuing violation. Specifically, Defendants proffer that the statute of limitations expired two years after the completion of the last condominium development, GWFCA, in 1995. Consequently, Defendants contend that

---

tiff's complaint will not be time-barred if the defendant's related wrongful acts continue into the statute of limitations time frame. *See id.* As a consequence, the statute of limitations only begins to run under the continuing violation doctrine upon the last act

in a series of related wrongful acts. The discovery rule, on the other hand, permits a plaintiff to raise a claim outside the statutory time frame upon her discovery of a defendant's wrongful act. *See Id.*

the last possible statute of limitations expired in 1997, thereby barring this action.[11]

■ In response, Plaintiffs argue that the continuing nature of the inaccessible features to disabled persons present within each of the three condominium developments constitutes a continuing violation under the FHA. Under the continuing violation doctrine, the statute of limitations is tolled by the continuing discriminatory practice. Here, Plaintiffs contend that there has been no termination of the inaccessible features to individuals with a disability (hereinafter "inaccessible features") and therefore the statute of limitations has not yet begun to run. Even if the inaccessible features are not considered a continuing violation, Plaintiffs argue that the statute of limitations is not triggered by the act of the construction but rather by Plaintiffs' discovery of the FHA non-compliant buildings.

### 2. The plain language of the FHA and the continuing violation doctrine.

■ The crux of the statute of limitations issue is whether the existence of a FHA non-compliant building constitutes a continuing violation under the FHA. The Court first turns to the language of the FHA. The initial step in statutory construction is to consider the plain meaning of the statutory terms themselves. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *Hamilton v. 1st Source Bank*, 928 F.2d 86, 87 (4th Cir.1990) (en banc). Unless it specifies to the contrary, Congress intends the plain meaning of the statutory terms

to govern. *See United States v. Hunter*, 459 F.2d 205, 210 (4th Cir.1972) (citing *Caminetti v. United States*, 242 U.S. 470, 485–486, 37 S.Ct. 192, 61 L.Ed. 442).

The FHA provides that a plaintiff must file a lawsuit within two years after the *"occurrence* or the *termination* of an alleged discriminatory housing *practice* ...." 42 U.S.C. § 3613(a)(1)(A) (emphasis added).[12] In other words, it is either a discrete discriminatory event ("the occurrence ... of a discriminatory housing practice") **or** the last discriminatory event in a series of discriminatory events ("the termination of a discriminatory housing practice") that triggers the statute of limitations. The resolution of the statute of limitations at issue in this matter therefore turns upon three words: occurrence, termination, and practice. Because the word "practice" applies to both the occurrence and the termination, the Court accordingly begins with the plain meaning of the term "practice." "Precious little has been written in the federal courts (at any level) about the meaning of the term 'practice'...." *Council 31, Am. Fed'n of State, County and Mun. Employees v. Ward*, 771 F.Supp. 247, 250 (N.D.Ill.1991) *(rev'd on other grounds )* (discussing the term practice in the employment disparate impact context).

The plain meaning of "practice" as defined by Black's Law Dictionary is: "Repeated or customary action; habitual performance; a succession of acts of similar kind; custom; usage." BLACK's LAW DICTIONARY 1172 (6th ed.1991). Similarly, another dictionary define the term as: "[H]abitual or customary performance;

---

**11.** Plaintiffs filed the instant Complaint on November 19, 2001, requiring a trigger date of November 19, 1999 for the Complaint to be timely filed.

**12.** VA.CODE § 36–96.18 likewise provides for a two-year statute of limitations. Because the VHFHL and FHA contain identical language regarding the statute of limitations, the following analysis concerning the federal statute also applies to the Va.Code.

operation; habit; custom; repeated performance or systematic exercise." RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE—THE UNABRIDGED EDITION 1041 (1973).

As discussed above, under the FHA, it is either the "occurrence" or the "termination" of the discriminatory "practice," which triggers the statute of limitations. The definition of "occurrence" is: "A coming or happening. Any incident or event...." BLACK'S LAW DICTIONARY 1080 (6th ed.1991). When combined, the plain meaning of the "the occurrence ... of a discriminatory housing practice" is a discrete event or incident that encompasses a discriminatory custom. This statutory phrase is also commonly known as the "occurrence rule." *Cf. Hamilton*, 928 F.2d at 89 ("An occurrence rule is based upon the supposition that the adverse act serves to put the employee on notice.") Generally speaking, the occurrence rule ties the running of the limitations period to the occurrence of the act or omission causing the injury. *Douglas v. Stallings, M.D., Inc.*, 870 F.2d 1242, 1249 (7th Cir.1989); BLACK'S LAW DICTIONARY 1107 (7th ed.1999) (explaining that the "occurrence rule" is "[t]he rule that a limitations period begins to run when the alleged wrongful act or omission occurs, rather than when the plaintiff discovers the injury.")

Turning next to "termination," the definition is: "End in time or existence; close; cessation; conclusion." BLACK'S LAW DICTIONARY 1025 (6th ed.1991). The phrase "the termination of a discriminatory housing practice" thus plainly means the cessation of a discriminatory repeated action. It is this latter phrase, that is "the termi-

nation of a discriminatory housing practice," that supports the continuing violation doctrine. *See* H.R.REP. No. 100–711, at 33 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2194 ("A complaint must be filed within one year from the time the alleged discrimination *occurred* or *terminated.* The latter term is intended to reaffirm the concept of continuing violations, under which the statute of limitations is measured from the date of the last asserted *occurrence* of the unlawful practice.") (citing *Havens*, 455 U.S. at 380–81, 102 S.Ct. 1114 (emphasis added)).[13]

In sum, the plain language of the FHA indicates that an act, whether one in a series of many, or a single discrete occurrence, is necessary within the limitations period or the claim falls outside the statute of limitations.

### 3. The continuing violation doctrine.

■ Although the plain meaning of the statutory language is unambiguous on its face, the case law governing the evolution of the continuing violation doctrine offers further support that a discriminatory act within the statute of limitations is required to assert a claim based upon the continuing violation doctrine. *See Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952) ("Statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.") *See also* 2B NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 50.01 at 139 (6th ed. 2000) ("The common law, having been classified and arranged into a logical system of

---

**13.** The Legislative History refers to a one year statute of limitations for Administrative. (Department of Housing and Urban Development) enforcement, which otherwise mirrors the statute of limitations provision for private citizens. The statute of limitations for private citizens was increased from 180 days to two years in the same FHA amendment. *See* H.Rep. at 35.

doctrine, principles, rules, and practices, furnishes one of the most reliable backgrounds upon which analysis of the objects and purposes of a statute can be determined.") Here, the case law governing the continuing violation doctrine in civil rights disputes is most analogous to the facts of this case. There are some differences between gender and racial discrimination as opposed to discrimination based on disability.[14] Despite these differences, the case law analysis concerning the continuing violation doctrine in gender and racial discrimination contexts provides instructive guidance in applying the rule to a disability discrimination claim under the FHA. As evidenced in the following cases, application of the continuing violation doctrine requires that defendants' repeat acts regardless of whether the alleged discrimination is based on race, gender or disability.

Courts have considered the continuing violation doctrine in a variety of contexts including environmental, antitrust and most commonly civil rights. *See Velazquez v. Chardon,* 736 F.2d 831, 833 (1st Cir.1984) ("The continuing violations theory, which had its genesis in decisions interpreting Title VII of the Civil Rights Act of 1964, has been applied in a wide variety of circumstances.") Although the concept of a continuing violation is seemingly straightforward on its face, courts' interpretation and application of this doctrine vary widely. *See, e.g., Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164, 1165 (7th Cir.1996) ("The question

when conduct occurring outside the statute of limitations may, by virtue of its link with recent conduct, be made a basis for a legal claim is a vexing one, and not only in cases of sexual harassment.") (collecting cases). *See also,* Lisa S. Tsai, *Continuing Confusion: The Application of the Continuing Violation Doctrine to Sexual Harassment Law,* 79 Tex.L.Rev. 531, 531 n. 1 (2000). Courts, however, seem to agree that the continuing violation doctrine exception to the statute of limitations should be narrowly applied. *See Talbot v. Mobil Corp.,* 46 F.Supp.2d 468, 471 (E.D.Va.1999) (noting that the Fourth Circuit has not adopted a definitive continuing violation test, but that unpublished opinions "forecast the adoption of a test that construes continuing violations narrowly"). *See also Dixon v. Anderson,* 928 F.2d 212, 216 (6th Cir.1991) ("[C]ourts view 'continuing violations' as falling into two categories of 'narrowly limited exceptions' to the usual rule that 'statutes of limitations ... are triggered at the time the alleged discriminatory act occurred.") (citation omitted); 144 A.L.R.Fed. 307, Limitation of Actions Under the Americans With Disabilities Act (1998).

Generally, courts recognize two types of continuing violations: serial or systemic. The serial continuing violation is manifested in a series of related and continuing discriminatory acts, whereas the systemic continuing violation is usually found in an ongoing discriminatory policy or system. *See Deck v. City of Toledo,* 56 F.Supp.2d

---

**14.** In general, unlike "patterns" of racial or gender discrimination requiring wrongful intent, the construction of a FHA non-compliant building may result from neglect or oversight. *See Deck v. City of Toledo,* 56 F.Supp.2d 886, 894 (N.D.Oh.1999). *See also Alexander v. Choate,* 469 U.S. 287, 297, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (noting that discrimination on the basis of handicap is "most often

the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect.") Furthermore, and most relevant to this analysis, the effects of gender and racial discriminatory acts are not usually continuing in nature, unlike the continuing effects of the construction of a FHA non-compliant building.

886, 894 (N.D.Oh.1999). *See also Dixon,* 928 F.2d at 216–218.

Although courts vary in their application of the continuing violation doctrine,. two themes recur in the case law. First, in cases where a court found a continuing violation present, a discriminatory act occurred within the requisite statute of limitations time frame. Second, in cases where a court rejected the continuing violation doctrine an act was not present.[15]

The Supreme Court first recognized the continuing violation doctrine under the FHA in *Havens Realty Corporation v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). In *Havens,* the Supreme Court concluded that an action would not be time-barred where the plaintiffs challenged "an unlawful practice that continues into the limitations period." *Id.* at 381, 102 S.Ct. 1114. There, the specific activity challenged was racial steering, where apartment employees falsely informed potential black renters that no apartments were available while informing potential white renters that apartments were available. *See id.* at 363, 102 S.Ct. 1114. Notably, the Supreme Court deemed that the *Havens* plaintiffs' claims were "based not solely on isolated incidents . . . but a *continuing violation manifested in a number of incidents . . . .*" *Id.* (emphasis added).

The *Havens* decision buttresses the conclusion that a discriminatory act must occur within the statute of limitations time frame to constitute a continuing violation. In *Havens,* even though four of the five racial steering incidents occurred outside of the FHA statute of limitations, the Supreme Court applied the continuing violation doctrine because the violation was "manifested in a number of incidents— *including at least one*" that occurred within the statute of limitations. *Havens,* 455 U.S. at 380, 102 S.Ct. 1114 (emphasis added).

Similarly, courts have applied the continuing violation rule to cases arising under the ADA. *See Deck v. City of Toledo,* 56 F.Supp.2d 886 (N.D.Oh.1999). In *Deck,* the court concluded that a continuing violation was present where City of Toledo officials repeatedly failed to ensure that contractors' construction of handicap accessible sidewalks and curbs failed to comply with the ADA. *Deck,* 56 F.Supp.2d at 895. In so holding, the court applied a three-prong test developed by the Sixth Circuit to determine if a continuing violation is present. *See id.* at 893. First, the defendant's wrongful conduct continued after the first act that began the pattern. Second, the plaintiff's injury must continue. Third, the plaintiff's injury must have been avoidable if the defendant had ceased its wrongful conduct. *Id.* The court there applied these three prongs and found a continuing violation present. Notably, the court determined that the City of Toledo had engaged in a discriminatory practice,

---

**15.** The even narrower exception to this rule is the systemic continuing violation as applied in the First and Ninth Circuits. *See, e.g., Provencher v. CVS Pharmacy,* 145 F.3d 5, 14 (1st Cir.1998) (acknowledging that a claim for a systemic continuing violation "requires no identifiable act of discrimination in the limitations period, and refers to general practices or policies, such as hiring, promotion, training,. and compensation.") Because the inaccessible features in this case do not constitute an over-arching policy, the systemic continuing violation is inapposite here. Furthermore, even if the inaccessible features did constitute a policy, this Court is more persuaded by the Fifth Circuit's holding that a discriminatory act is required under the systemic continuing violation. *See Abrams v. Baylor College of Medicine,* 805 F.2d 528, 533–34 (5th Cir.1986) (holding that a continuing systemic violation requires that a plaintiff must demonstrate some discriminatory act within the requisite time frame).

namely repeated failure to supervise municipal public works contractors failing to construct handicap accessible sidewalks and curbs. The court held that the continuing violation doctrine applied because "at least one ·of the ramps was installed within the statutory two year period. . . ." *Id.* at 895.

### 4. Continuing *effects* v. continuing *violation.*

In contrast to *Havens,* the Supreme Court has consistently held that a continuing violation was not present where there was a subsequent effect resulting from the defendant's prior discriminatory act. "[T]he emphasis should not be placed ·on mere continuity; the critical question is whether any present violation exists." *United Air Lines v. Evans,* 431 U.S. 553, 557, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (holding that the present discriminatory effect of a facially neutral seniority system resulting from a prior discriminatory termination was not a continuing violation); *Lorance v. AT & T Techs., Inc.,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989) (rejecting the theoretical statutory construct that "to regard the employer as having been guilty of a continuing violation which 'occurred,' . . . not only when the contractual right was eliminated but also when each of the concrete effects of that elimination was felt").

For instance in *Delaware State College v. Ricks,* the Court determined that the plaintiff's loss of his college professor position was a result of the College Board's earlier decision to refuse him tenure. 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). In so holding, the Supreme Court recognized that "[t]he emphasis is not upon the effects of earlier employment decisions; rather, it 'is [upon] whether any present violation exists'" *Ricks,* 449 U.S. at 258, 101 S.Ct. 498 (citing *United Air Lines, Inc.,* 431 U.S. at 558, 97 S.Ct. 1885) (emphasis in original). Although the *Ricks* decision concerned an employment discrimination action, the analysis is equally applicable to this case. The proper emphasis here must remain on Defendants' acts (*i.e.,* the design and construction of non-compliant buildings), rather than the continuing effects (*i.e.,* the continuing inaccessible features) that those acts caused.

Similarly, the Fourth Circuit has rejected the continuing violation doctrine where an effect is continuing, but the defendant's act is not. *See, e.g., National Advertising Co. v. City of Raleigh,* 947 F.2d 1158 (4th Cir.1991); *Jersey Heights Neighborhood Assoc. v. Glendening,* 174 F.3d 180 (4th Cir.1999). In *National Advertising,* the Fourth Circuit rejected the appellant's contention that an ordinance established in 1983 constituted a continuing violation. 947 F.2d at 1166. In rejecting the appellant's contention, the Fourth Circuit observed that "[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Id.* (citations omitted).[16]

---

**16.** Several other Circuits are consistent in refusing to apply the continuing violation doctrine to continuing effects of a prior discriminatory act. *See Tolbert v. State of Ohio Dep't of Transportation,* 172 F.3d 934, 940 (6th Cir. 1999) (holding that the alleged discriminatory allocation of sound barriers along a city highway was not a continuing violation because "the continuing lack of such measures constitute[d] a 'continuing ill effect,' and [wa]s not the result of continuing unlawful acts."); *Perez v. Laredo Junior College,* 706 F.2d 731, 734 (5th Cir.1983) (refusing to apply the continuing violation doctrine where "[e]ven though the damages resulting from that act, loss of pay, may continue, the wrongful act itself, the denial of the claim for pay, did not. By simple analogy, the event was like a tort that injures a person causing him to lose income for months or years thereafter. The cause of

Based on this precedent, it is clear that the continuing effects of a previous discriminatory act do not constitute a continuing violation. As elaborated in the following section, this Court finds these cases binding here and holds that a FHA non-compliant building which contains inaccessible features to disabled persons is more akin to a continuing effect rather than a continuing violation under the FHA.

### 5. Application

■ The FHA provides that a plaintiff must file a lawsuit within two years after the "*occurrence* or the *termination* of an alleged discriminatory housing *practice* ...." 42 U.S.C. § 3613(a)(1)(A) (emphasis added). On its face, the plain meaning of the statute indicates that an act must occur within the limitations period. *See* discussion *supra* Part II.B.2. Here, the existence of allegedly non-compliant FHA condominium complexes, as pled by Plaintiffs, is not an occurrence or act that Defendants have done or performed within the requisite statute of limitations time frame. The last FHA non-compliant condominium development at issue in this matter was constructed more than two years before this suit commenced. The existence of inaccessible features in the buildings is rather an ongoing *result* or *effect* of Defendants actions. Nowhere in their Complaint, do Plaintiffs allege that Defendants have "done" or "performed" a discriminatory act within the two years preceding the filing of their Complaint. There is no allegation that Defendants have repeated some discriminatory act of

design and construction within the statutory period.

Moreover, the case law governing the continuing violation doctrine supports the plain meaning of the statute that a discriminatory act must occur during the statutory limitations period. *See* discussion *supra* Part II.B.3. Unlike *Havens*, for instance, no *act* has occurred within the relevant time period in this case to extend the statute of limitations. The alleged discriminatory act occurred at the design and construction of the building and the defendants have not undertaken any action since. Conversely, the case law rejects the proposition that a continuing effect of a discriminatory act constitutes a continuing violation. *See* discussion Part II.B.4. Here, the existence of buildings with inaccessible features is a result or effect of Defendants' prior acts of designing and constructing FHA non-compliant buildings not a continuing violation manifesting itself in a series of incidents.

Plaintiffs cite to several district court cases in an attempt to lend support to the application of the continuing violation doctrine to this case.[17] However, the Court finds these cases unpersuasive. Plaintiffs rely heavily on *Eastern Paralyzed Veterans Assoc. v. Lazarus–Burman .Assoc.* 133 F.Supp.2d 203. In *Eastern Paralyzed,* the plaintiffs alleged that a housing development intended for persons over 62 was inaccessible to persons in wheelchairs because the ground units had steps leading to the entrance, the thermostats were

---

action *accrues* when the tort is committed."); *Velazquez v. Chardon,* 736 F.2d 831, 833 (1st Cir.1984) (holding that a plaintiff must demonstrate that "not only the injury, but the discrimination, is in fact ongoing.") (citation omitted).

**17.** The cases relied on by Plaintiffs are *Eastern Paralyzed Veterans Assoc. v. Lazarus–Bur-*

*man Assoc.,* 133 F.Supp.2d 203, 205 (E.D.N.Y.2001); *Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.,* 40 F.Supp.2d 700, 710 (D.Md.1999); *Montana Fair Hous., Inc. v. Am. Capital Dev., Inc.,* 81 F.Supp.2d 1057 (D.Mont.1999); *Schonfeld v. City of Carlsbad,* 978 F.Supp. 1329 (S.D.Cal.1997).

placed too high and interior doorways were too narrow. *See id.* at 205. Relying on *Havens* and Second Circuit case law, the court summarily concluded that the "challenged discriminatory housing practice [was] clearly a continuing violation," because inaccessible features constituted an "ongoing policy," not a discrete event. *Id.* at 212. The *Eastern Paralyzed* court, however, did not conduct a statutory construction analysis nor extensively analyze whether the facts before it were substantially similar to those in *Havens.* The court simply assumed that a racial steering housing allegation was tantamount to a disability design and construction claim. Therefore, this Court finds the reasoning and conclusion in *Eastern Paralyzed* unpersuasive.

The remaining cases that Plaintiffs cite are either factually distinguishable from the case at bar or do not stand for the proposition asserted by the Plaintiffs. *See Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.,* 40 F.Supp.2d 700, 710 (D.Md.1999) (holding that the last occurrence of the violations was the sale of the last inaccessible unit or in the alternative that the trigger was the plaintiff's visit to the development); *Montana Fair Hous., Inc. v. American Capital Dev., Inc.,* 81 F.Supp.2d 1057, 1063 (D.Mont.1999) (finding that the statute of limitations period was triggered by the installation of a ramp because "the continuing violations doctrine requires that at least one incident of discrimination must fall within the statute of limitations period."); *Schonfeld v. City of Carlsbad,* 978 F.Supp. 1329, 1333 (S.D.Cal. 1997) (holding that continuing inadequate access constituted a continuing violation

under the ADA, which does not contain a specific statute of limitations).

To the extent these cases hold that a non-complaint FHA building constitutes a continuing violation, they conflict with the plain language of the Act and precedent concerning continuing violations and continuing effects. Further, holding that a non-complaint FHA building constitutes a continuing violation, as those cases did, eviscerates the statute of limitations with respect to design and construction claims. If the mere existence of a FHA non-compliant building is a continuing violation under the FHA then there is no limitations period on a disability discrimination claim involving design and construction. This Court notes the salutary purpose of the FHA is to increase the availability of FHA compliant housing to the disabled in the market place. Builders and designers should comply with the law and assure that there are no barriers to access for the disabled among us. However, it strains statutory construction of the FHA to unreasonable limits to read "continuing" into the very existence of a completed FHA non-compliant building. The liability of builders and architects for violations of the FHA must be found within the plain words of the statutory provision for two years. Judicial expansion of liability into infinite limits is not supported by the case law nor the canons of statutory construction.[18]

Conversely, refraining from applying the continuing violation doctrine in this context does not preclude a plaintiff from a remedy or frustrate the underlying polices of the FHA. In general, a plaintiff would have two years from the time a building is constructed to bring a claim under the

---

**18.** *See Abrams v. Baylor College of Medicine,* 805 F.2d 528, 533–34 (5th Cir.1986) ("[T]he existence of a quiescent discriminatory policy is simply insufficient to toll the statute of limitations. To hold to the contrary would expose employers to a virtually open-ended period of liability and would, as we said, read the statute of limitations right out of existence.").

design and construct statutory provision, 42 U.S.C. § 3604(f)(3)(C). After the two year time period has expired, a plaintiff could resort to seeking a reasonable accommodation, which if refused would give rise to a reasonable accommodation claim under 42 U.S.C. § 3604(f)(3)(A).

## 6. The Discovery Rule

 Having determined that the continuing violation doctrine is inapplicable in this matter, this Court next considers the applicability of the discovery rule that Plaintiffs propose.[19] The discovery rule provides that under certain circumstances a statute of limitations may extend to when a plaintiff first discovers a defendant's wrongful act. *See United States v. Kubrick,* 444 U.S. 111, 113, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).[20] For instance, in *Kubrick,* the Supreme Court held that the plain language of the Federal Tort Claims Act ("FTCA") indicated that Congress had intended the adoption of the discovery rule with respect to tort claims brought under the statute. Relying on the term "accrual" in the FTCA, the Supreme Court found that the limitations period begins to run from "when the plaintiff knows both the existence and the cause of his injury," not "when he also knows that the acts inflicting the injury may constitute medical malpractice." *Id.* at 113, 100 S.Ct. 352.

The Fourth Circuit has also considered the applicability of the discovery rule in various other contexts. In *Hamilton v. 1st Source Bank,* the Fourth Circuit sitting *en banc* determined that the discovery rule did not apply within the statutory framework of the Age Discrimination Employment Act ("ADEA"). 928 F.2d at 86. The ADEA provides that a charge must be filed "within 180 days after the alleged unlawful practice *occurred* . . . ." 29 U.S.C. § 626(d) (emphasis added). The Fourth Circuit refused to apply the discovery rule because the statutory language of the ADEA clearly and unambiguously states that the clock begins to run from the occurrence of the violation, not its discovery, or as in the FTCA, its accrual. *See Hamilton,* 928 F.2d at 87–90. The court also contrasted the ADEA's language with statutes specifically providing for the discovery rule. *See Id.* Conversely, the Fourth Circuit has applied the discovery rule where the statutory language is ambiguous or vague and employs such key words as "accrues" or "arises." *See, e.g., Nasim v. Warden,* 64 F.3d 951, 955 (4th Cir.1995) (*en banc* ) (holding that "under federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal . . . .") (emphasis added).

 Here, the statutory language of the FHA tracks the clear terms of the ADEA, rather than the ambiguity of the FTCA. The FHA unambiguously states that the "occurrence" of the discriminatory act will trigger the statute of limitations. *See* 42 U.S.C. § 3613(a)(1)(A) (plaintiff must file lawsuit within two years after the "*occurrence* or the *termination* of an alleged discriminatory housing *practice* . . . .") (emphasis added). Therefore, the discovery rule does not apply here.

**19.** Moseke first discovered the exterior inaccessibility of features in the summer of 1999. Because the Complaint was filed more than two years after her discovery, the discovery rule would not benefit Moseke. The ERC, however, first discovered the inaccessibility through Moseke's complaint filed in January 2000. Since the ERC's discovery was within two years of the filing date of the Complaint, the ERC would not be time-barred if the discovery rule applies.

**20.** *See also* MacAyeal, 15 Va.Envtl.L.J. at 601–606 (1996) (providing general discussion of policy behind discovery rule and its common law development).

Having rejected both of Plaintiffs' contentions regarding the extension of the statute of limitations, this Court looks only to Plaintiffs' Complaint and finds that Plaintiffs have failed to plead that Defendants committed an act within two years of when the Complaint was filed. *See Dickey v. Greene,* 729 F.2d 957 (4th Cir.1984) (*en banc*) (holding that under Rule 12(b)(6) the court must only consider plaintiff's allegations). The usual recourse would be to permit Plaintiffs leave to amend their Complaint under FED.R.CIV.P. 15(a) "when justice so requires." Leave to amend is denied only when the amendment would be "prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Edell & Assoc. v. Law Offices of Peter G. Angelos,* 264 F.3d 424, 446 (4th Cir.2001). Here, granting leave to amend would be unavailing to Plaintiffs because amending the Complaint would prove futile. *See id.* Defendants' proffer in sworn affidavits that the last condominium complex construction was completed in 1997. This Court exercises its discretion under Rule 15(a) and finds that Plaintiffs cannot allege any discriminatory design and construct acts within the two years prior to the filing of the Complaint, specifically the time period between November 19, 1999 and November 19, 2001.

### III. CONCLUSION

In sum, the Court first holds that ERC has standing in this case. At this stage in the litigation, ERC has alleged sufficient facts demonstrating a palpable injury in the form of a substantial diversion of its limited resources to address the Defendants' alleged discriminatory practices. Second, this Court holds that Plaintiffs'

design and construction claim against the Defendants is effectively time-barred under both the FHA and VHFL.[21] The Court finds that the completion of the construction triggered the FHA statute of limitations for a design and construct claim and that neither the continuing violation doctrine nor the discovery rule are applicable here. Therefore, the Court holds that the existence of a FHA non-compliant building is not a continuing violation of the FHA. Moreover, this Court holds that an act of discrimination must occur within the limitations period and a plaintiff's complaint must be filed within two years of that discriminatory act in order to sustain a design and construction cause of action under the FHA. Although ERC has standing in this matter, because its claim is based solely on the design and construction allegations, ERC's claim is dismissed because it was not filed within the applicable statute of limitations.

Accordingly, it is hereby

ORDERED that Defendants' Motion to Dismiss Plaintiffs' design and construction claim is GRANTED and this claim is dismissed with respect to the following Defendants: 1) Miller and Smith, Inc; 2) Miller and Smith Holding, Inc; 3) Miller and Smith Land, Inc; 4) Miller and Smith Commercial Properties, Inc.; 5) Miller and Smith Homes, Inc.; 6) BC Consultants, Inc.; 7) Christopher Consultants, Ltd.; and 8) Gates at West Falls, A Condominium Association, Inc.

It is further ORDERED that Plaintiff Moseke and Defendants Eton Square Condominium Association, Inc., and Baldwin Grove, A Condominium Association, Inc., are directed to schedule a Rule 16(b) Conference to reestablish discovery and trial

---

**21.** Plaintiffs do not specifically plead when ESCA refused Moseke's request for a reasonable accommodation. Accordingly, this Court does not reach a finding as to whether this cause of action is time-barred.

deadlines forthwith. Upon completion of the Rule 16(b) conference the stay of discovery shall be lifted.

The Clerk is directed to forward a copy of this Order to counsel of record.

## ORDER

THIS MATTER is before the Court on Defendants' Motion to Dismiss Plaintiffs' Complaint under FED.R.CIV.P. 12(b)(1) and 12(b)(6). For the reasons stated in the accompanying memorandum opinion, it is hereby

ORDERED that Defendants' Motion to Dismiss the design and construction claim under the Federal Fair Housing Act, 42 U.S.C. § 3601 (2000), *et seq.*, and the Virginia Fair Housing Law, VA.CODE ANN. § 36–96.1 (2000), *et seq.*, is GRANTED. The above captioned case is dismissed with respect to the following Defendants: 1) Miller and Smith, Inc; 2) Miller and Smith Holding, Inc; 3) Miller and Smith Land, Inc; 4) Miller and Smith Commercial Properties, Inc.; 5) Miller and Smith Homes, Inc.; 6) BC Consultants, Inc.; 7) Christopher Consultants, Ltd.; and 8) Gates at West Falls, A Condominium Association, Inc. Since Plaintiff Equal Rights Center's claim is based solely on the design and construction allegations, its claim is dismissed.

It is further ORDERED that the Plaintiff Tonya Moseke and Defendants Eton Square Condominium Association, Inc., and Baldwin Grove, A Condominium Association, Inc., are DIRECTED to schedule a Rule 16(b) Conference to reestablish discovery and trial deadlines forthwith. Upon completion of the Rule 16(b) conference the stay of discovery shall be lifted.

The Clerk is directed to forward a copy of this Order to counsel of record.